**BLAGDEN ALLEY ASSOCIATION, Petitioner,**

v.

**DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent,**

**RWN Development Group, Inc., Intervenor.**

No. 90–980.

District of Columbia Court of Appeals.

Argued March 5, 1991.
Decided April 29, 1991.

Cornish Hitchcock, Washington, D.C., for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, with whom Herbert O. Reid, Corp. Counsel at the time the memorandum was filed, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, were on the memorandum in lieu of brief, Washington, D.C., for respondent.

Cynthia A. Giordano, with whom Michael A. Cain was on the brief, Washington, D.C., for intervenor.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and MACK, Senior Judge.

ROGERS, Chief Judge:

Petitioner Blagden Alley Association challenges an order of the District of Columbia Zoning Commission (the Commission) approving a housing "linkage" proposal as a condition for granting intervenor's application for a Planned Unit Development. Petitioner contends that (1) the Commission lacked the legal authority to approve such a linkage proposal, (2) the Commission violated its own regulations in approving the application, (3) the applica-

tion conflicts with the District of Columbia Comprehensive Plan Act, and (4) the record before the Commission was deficient. Although we reject the Association's first contention, we conclude that the Commission failed adequately to address the other arguments. Accordingly, we remand for further proceedings.

## I.

RWN Development Group, Inc., intervenor, (RWN) owns a parcel of land located at 1212 Massachusetts Avenue, N.W. The site is bounded on the north by Massachusetts Avenue, on the east by 12th Street, on the south by "L" Street, and on the west by 13th Street, and covers a total of 14,478 square feet. In 1988 the Board of Zoning Adjustment (BZA) approved RWN's plan to construct a building containing a hotel and certain "special purpose" office uses, consistent with the HR/SP-2 zoning classification for that site.[1]

RWN later decided that a glut of nearby hotels rendered the hotel project only marginally economically feasible. It therefore applied to the Zoning Commission for a planned unit development (P.U.D.) which would allow it to erect a ten-story general purpose office building.[2] RWN's original proposal asked that the site be rezoned to C-4, in order to allow it to construct a ten-story office building.[3] RWN agreed to contribute $2 million toward the development of 59 low-income housing units at a city-owned site near Fifth and K Streets, N.W. The Office of Planning for the District of Columbia opposed the application, in part because the proposal did not "give enough to Massachusetts Avenue or the immediate area to compensate for the fact that its height is over 90 feet."

In response to these criticisms, RWN met with several community groups and submitted a revised proposal. First, instead of the $2 million donation, RWN offered to purchase and renovate the north side of the 1100 block of "O" Street, N.W., which contains five boarded-up, Victorian-style townhouses, an abandoned three-story apartment building, and six vacant lots. Neighborhood representatives suggested this site because the vacant buildings are being used for drug dealing and the entire block serves as a large, open-air drug market. RWN also changed its request for rezoning to ask for C-3-C zoning with an "HR" hotel/residential overlay.[4]

The Commission decided to hold hearings on this revised application. RWN's architect testified that the site's size and shape did not lend itself to mixed-use development. An economic expert also testified for RWN that the original hotel project was economically infeasible. During the course of the hearings, RWN refined the

1. The "SP-2" zoning category permits medium/high density development, including residential uses and special purpose offices (nonprofit organizations, trade associations and professionals), if approved by the BZA. The maximum height for development in this area is 90 feet, and the maximum floor area ratio ("FAR") generally permitted is 6.0 for residential uses and 3.5 for other permitted uses. 11 DCMR §§ 530.1, 531.1, 532.1 (1987). The "HR" label ("hotel/residential incentive overlay") is added to other zoning classifications to provide an incentive for hotel and residential uses. Any hotel or residential building in an HR district is permitted a maximum FAR of 8.5. *Id.* §§ 1101. The hotel project approved by the BZA for this site had a total FAR of 8.5, 5.0 for the hotel and 3.5 for the office uses.

2. The P.U.D. process is designed to give a developer "greater flexibility in planning and design than may be possible under conventional zoning procedures," 11 DCMR § 2400.5 (1987), on condition that the developer provide "present or future occupants of planned unit developments with a living or working environment and amenities superior to those that could be achieved" under existing zoning. A P.U.D. applicant generally requests that a site be rezoned to allow more intensive development, in exchange for which the applicant offers to provide "amenities" or "public benefits" which would not be provided if the site were developed under matter-of-right zoning. *Id.* § 2400.2. *See generally* R. ANDERSON, AMERICAN LAW OF ZONING, §§ 11.-12 to 11.15 (3d ed. 1986).

3. C-4 zoning permits all kinds of office uses and a variety of retail and service uses to a maximum FAR of 10.0 and a maximum height of 130 feet. 11 DCMR §§ 750–54.

4. C-3-C zoning is somewhat more restrictive than C-4, with a maximum FAR of 6.5 and a maximum height of 90 feet. 11 DCMR §§ 740.-8, 770.1, 772.1.

proposal to specify that the "O" Street units would be sold to people who qualify for aid under the District's Home Purchase Assistance Program, D.C.Code §§ 45–2201 to 45–2205 (1990), as well as to D.C. fire fighters, school teachers and police officers.[5] RWN also agreed to contribute an additional $100,000 toward the renovation of six low-income apartment buildings located at 11th and "O" Streets, N.W. RWN specified that a certificate of occupancy would not be issued for the office building until the "O" Street units were ready for occupancy.

The local Advisory Neighborhood Commission (ANC), various community groups and several area residents testified in favor of the proposal, on the ground that the proposed housing amenity would help to eradicate the drug dealing in the area and to stabilize the community. The Office of Planning commented that the revised proposal addressed some of its concerns about the previous proposal, but concluded that RWN still had not offered to provide enough housing. Petitioner Blagden Alley Association (the Association) and other citizen groups and individuals opposed the proposal. The Association argued, among other things, that the Commission lacked authority under its enabling statute or regulations to approve a P.U.D. with off-site amenities, and that the proposed P.U.D. was inconsistent with the Comprehensive Plan for the National Capital, 10 DCMR §§ 100–1139 (1989), as amended by D.C. Law 8–129, *reprinted at* 37 D.C.Reg. 55 *et seq.* (Jan. 5, 1990).

After the hearings, the District of Columbia Office of Business and Economic Development submitted a report estimating that the value of the proposed rezoning for the site was $12 million without adjusting for the cost of the off-site amenities. This estimate substantially exceeded both RWN's estimate of $4 million and the Association's estimate of $7.1 million. Faced with this new information, the Commission

decided to hold another hearing "limited to the provision of the applicant's amenity package." The Commission expressed interest in "a revised amenity proposal that includes an on-site amenity in addition to maintaining and increasing the proffered off-site housing amenity."

At the additional hearing, RWN presented expert testimony reiterating its position that on-site housing was not feasible. RWN did increase its proffer of off-site amenities, however, agreeing to build or renovate an additional 30 units of low and moderate income housing within the boundaries of ANC–2C at some point within the next seven years. The Office of Planning, based on this increased amenity offer, supported the application.

The Commission voted to approve the application. The Commission found that on-site housing was not feasible at the Massachusetts Avenue site, but that the off-site "O" Street housing amenity, in addition to the extra 30 units over the next seven years, would provide "an important benefit to the city and the neighborhood." The Commission concluded that the P.U.D. design "is a preferred alternative to the BZA approved plan" for the hotel project, and that the P.U.D. was not inconsistent with the Comprehensive Plan.

The Commission order approving the application contains conditions designed to insure that the office building would be constructed in the manner described. The order also states that no certificate of occupancy shall be issued for the office building until RWN "has completed and made ready-for-occupancy all of the proposed housing units on the 1100 block of 'O' Street, N.W. and has certified the completion of said housing units for the Zoning Commission." RWN was required to record a covenant for the "O" Street housing site restricting its use to non-transient residential use. The Commission also added a condition that the 30 additional hous-

---

5. RWN also agreed that a lien securing a note would be placed on each unit in an amount equalling the difference between the market value of the unit and the purchase price, in an effort to prevent early tenants from capturing a windfall when property values increased. The proceeds from the note would go to MANNA, Inc., a non-profit developer of low and moderate income housing.

ing units must be made available to low and moderate income residents, and that if RWN failed to construct the units within seven years the certificate of occupancy for the office building would be revoked. The Association timely appealed to this court.

## II.

The Association contends that the Commission exceeded its authority in approving the off-site housing amenity as part of the P.U.D. According to the Association, because the Council of the District of Columbia has not specifically authorized off-site housing linkage, the Commission is without authority to approve a P.U.D. with an off-site housing component. The Association's argument is unpersuasive.[6]

The Zoning Commission is established by D.C.Code § 5–412, which states that "the Zoning Commission shall exercise all the powers and perform all the duties with respect to zoning in the District as provided by law." D.C.Code § 5–412(e) (1988). The Zoning Act further provides:

> To promote the health, safety, morals, convenience, order, prosperity, or general welfare of the District of Columbia and its planning and orderly development as the national capital, the Zoning Commission ... is hereby empowered ... to regulate the location, height, bulk, number of stories, and size of the buildings and other structures, the percentage of lot which may be occupied, the sizes of yards, courts, and other open spaces, the density of population, and the uses of buildings, structures, and land for trade, industry, residence, recreation, public activities, or other purposes....
>
> [Z]oning regulations shall be designed to lessen congestion in the street, to secure safety from fire, panic, and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the undue concentration and the overcrowding of land, and to promote such distribution of population and of the uses of land as would tend to create conditions favorable to health, safety, transportation, prosperity, protection of property, civic activity, and recreational, educational, and cultural opportunities....

D.C.Code §§ 5–413, 5–414 (1988). The court has described these statutes as granting "the Commission a broad general authority" over zoning matters. *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 355 A.2d 550, 556 (D.C.1976).

In *Dupont Circle, supra,* the court upheld the Commission's authority to grant P.U.D. applications despite the absence of any explicit delegation of authority from the D.C. Council.[7] The court, noting that those challenging the Commission's authority cited no authority, turned to the language of the Act, which it found to be not materially unlike provisions of the Standard State Zoning Enabling Act that granted broad authority "with an itemization of the broad purposes of zoning." *Id.* at 556.

**6.** The Association also contends that a remand is required because the Commission failed to address this argument. Although the court will accord deference to an agency's interpretation of the statute it is charged with enforcing, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), the question whether the Commission has exceeded its authority under the statute is

> largely unrelated to the agency's expertise.... That an agency may adopt an interpretation maximizing its own authority is not surprising, but we do not believe we can fairly afford such an interpretation the same degree of deference that is generally given to the interpretation of those portions of the statute directly related to the expertise of the agency involved.

*Dow Chem. Co. v. United States Envtl. Protection Agency,* 605 F.2d 673, 681–82 (3d Cir.1979); *see also Railco Multi–Constr. Co. v. Robert Gardner,* 564 A.2d 1167, 1169 (D.C.1989) (refusing to defer to agency resolution of a "question involv[ing] considerations generally not invoking the reasons for which courts will defer to agency expertise"); Sunstein, *Law and Administration After* Chevron, 90 Colum.L.Rev. 2071, 2100 (1990) ("no deference will be accorded to the agency when the issue is whether the agency's authority extends to a broad area of regulation, or to a large category of cases...."). Thus, we need not remand on this issue.

**7.** Specifically, the court rejected the claim that the Zoning Act and regulations did not permit the Commission to approve a transfer of development rights within a P.U.D. *Id.* at 556.

The *Dupont Circle* court also rejected several similar challenges to the Commission's authority, relying on the Commission's general grant of authority "to promote the general welfare of the District of Columbia and its planning and orderly development as the national capital." *Id.* at 557 (quoting D.C.Code § 5–413). It reasoned from the "official recognition of ... the utility of the development rights concept to a PUD." *Id.*

■ The reasoning of the *Dupont Circle* decision requires that we reject the Association's challenge to the Commission's authority to approve a P.U.D. with an off-site housing amenity. The Association concedes that the Commission has the power to approve *on-site* amenities. Nothing in the broad language of the enabling statute, however, would justify drawing a sharp line between on-site housing linkage and off-site housing linkage. In both situations the Commission is acting under its broad authority "to promote the health, safety, morals, convenience, order, prosperity, or general welfare of the District of Columbia [by] regulat[ing] the location, height, bulk, number of stories and size of buildings and other structures...." D.C.Code § 5–413 (1988).

The Association correctly states that the D.C. Council, no less than the Commission, plays an important role in zoning matters. Thus, the Council could presumably enact legislation prohibiting or otherwise limiting the Commission's ability to approve housing linkage.[8] The Council has not acted either to authorize linkage or to forbid it, however. Although such legislative silence does not constitute, as RWN argues, acquiescence in the Commission's decision to authorize P.U.D.'s with housing linkage,[9] neither does the Council's failure to act lessen the Commission's authority under the broad language of its enabling legislation.

The Association claims that "courts in other jurisdictions have held that enabling statutes which are as broadly written as the ones at issue here do not allow zoning bodies to condition approval of a PUD on the provision of off-site amenities." None of the cases cited by the Association, however, support its contention that the Commission acted beyond its authority in granting the P.U.D. application in this case. In three of the cases cited by the Association, *Tri–State Generation and Transmission Co. v. City of Thornton*, 647 P.2d 670 (Colo.1982), *Prince George's County v. M & B Construction Corp.*, 267 Md. 338, 297 A.2d 683 (1972), and *City of Miami v. Save Brickell Avenue, Inc.*, 426 So.2d 1100 (Fla. App.1983), the courts, while emphasizing the need for standards to guide zoning decisions, upheld the zoning ordinances at issue because they contained sufficient standards to guide the zoning body. Moreover, these decisions were concerned with the "arbitrary state action" caused by standardless decisionmaking. *Tri–State Generation, supra*, 647 P.2d at 678. Thus, in upholding the ordinances the courts relied not just on standards derived from the enabling legislation, but also on "standards ... incorporated into [the] planned development ordinance[s]" adopted by the zoning body itself. *Id.* The Association's challenge, by contrast, focuses not on the Commission's failure to enact regulations with sufficiently clear standards; the Association challenges the Commission's authority under the enabling statutes. Thus, if the Association prevails in this challenge, the

---

**8.** RWN contends that the Council might lack the authority to enact such legislation. RWN relies on the fact that Congress "is the ultimate repository of legislative power in and for the District of Columbia" and that Congress has not made "an exclusive delegation with respect to land use" to the Council. Of course, we need not decide in this case whether the Council has such authority, because the Council has not yet attempted to exercise it. We note, however, that the Home Rule Act grants the Council broad authority to legislate in many areas. *See* D.C. Code §§ 1–201(a), 1–227, 1–233(b) (1987).

**9.** The legislature is presumed to have acquiesced in an agency's interpretation of a statute only "[w]hen the statute giving rise to the [agency's] longstanding interpretation has been reenacted without pertinent change." *Federal Deposit Ins. Corp. v. Philadelphia Gear Corp.*, 476 U.S. 426, 437, 106 S.Ct. 1931, 1937, 90 L.Ed.2d 428 (1986). The Commission's recent efforts to use housing linkage hardly qualify as a longstanding interpretation.

Commission would be powerless to approve housing linkage even if the Commission later adopts regulations with elaborate standards. These three cases dealing with the adequacy of regulatory standards are therefore inapposite to the Association's challenge to the Commission's general authority.

In *Longridge Builders, Inc. v. Planning Bd. of Princeton*, 52 N.J. 348, 245 A.2d 336 (1968), the planning board approved a proposed subdivision plan on condition that the applicant pave an unimproved road extending from the subdivision to an existing public road. The court concluded that the planning board decision was improper, but expressly refused to decide "whether the Planning Act authorizes a municipality to impose upon a subdivider, as a planning matter, the duty to provide off-site improvements." 245 A.2d at 337. Instead, the court relied on the fact that the municipal planning board had acted in the absence of any regulations governing such conditions, despite the fact that a New Jersey statute required that such decisions be made "in conformity with standards set forth" by regulations.[10]

Although *Bonan v. General Hosp. Corp.*, Civ. No. 76348 (Mass.Super.Ct. March 31, 1986), *rev. on other grounds, Bonan v. City of Boston*, 398 Mass. 315, 496 N.E.2d 640 (1986), provides the best support for the Association's argument, upon analysis that case, too, is distinguishable. The *Bonan* trial court struck down a zoning regulation which "requir[ed] large scale developers, as a condition of the grant of deviations from the zoning code or the grant of an amendment to the zoning map, to contribute monies to" a trust fund dedicated to the construction of low and moderate income housing. Slip op. at 14.[11] The trial court concluded that the regulation exceeded the power of the Boston Zoning Commission, relying in part on its con-

clusion that the regulation "so closely resembles a tax that, by the rules of statutory construction in the Commonwealth, its authorization, if in fact it were authorized, would have to have been express." *Id.* at 19 (citing *Martin L. Hall Co. v. Commonwealth*, 215 Mass. 326, 329, 102 N.E. 364 (1913) ("if the right to tax is not plainly conferred by the statute, it is not to be extended by implication")). Because the relevant zoning enabling act contained no express "power to exact a fee," the court concluded that the Boston commission had exceeded its authority. The *Bonan* decision therefore has little relevance to the instant case, in which the Commission has not attempted to "exact a fee" or otherwise compel an unwilling developer to provide an off-site amenity.

In distinguishing these cases we do not minimize the Association's concern about the potential for arbitrary action by a zoning authority. However, the Association's contentions here do not focus on the absence of adequate standards so much as on the fact that off-site amenities are unrelated to the essential purposes of P.U.D.'s as they developed in this country.[12] Of course, when the P.U.D. concept is applied to an urban setting it is entirely possible that the rationale underlying the relaxation of zoning requirements could incorporate amenities directed at a broader community. *Cf. Dupont Circle, supra*, 355 A.2d at 557 ("we know of no good reason why, in making [the determination whether a P.U.D. project meets the FAR requirements] it may not take into consideration a mutually agreed upon transfer of development rights"). Still, we, like the Association, are wary of the effect of a policy that relaxes zoning restrictions while according, without some articulated standards, benefits elsewhere. *See* Part III, *infra*. These considerations, however, are matters of policy for decision by the legislature and

10. We consider below whether the Commission's decision in the instant case was consistent with its own regulations. *See* Part III, *infra*.

11. On appeal, the Massachusetts Supreme Judicial Court reversed the decision on the ground that Bonan and the other plaintiffs lacked standing to challenge the ordinance. *See* 496 N.E.2d at 642.

12. *See* R. ANDERSON, AMERICAN LAW OF ZONING, *supra* note 2, §§ 11.12 to 11.15; Lloyd, *A Developer Looks at Planned Unit Development*, 114 U.PENN. L.REV. 1 (1965).

the Zoning Commission, and not the court, at least not in the first instance. Accordingly, we conclude in light of the broad grant of legislative authority confirmed by *Dupont Circle, supra,* that the Commission did not exceed its authority in approving a P.U.D. application which included an off-site housing amenity in the nearby neighborhood.

### III.

■ The Association contends that the Commission's decision to approve a P.U.D. with off-site housing is inconsistent with the Commission's regulations. The Association also complains that the Commission's decision failed to address this issue. We agree that the Commission should explain how RWN's P.U.D. is consistent with the regulations. Accordingly, we remand for further findings.

As defined by the regulations, the P.U.D. process is "designed to facilitate the development of well-planned residential, institutional, commercial, and mixed use developments...." 11 DCMR § 2400.1 (1987). "Sound project planning, efficient and economical land utilization, attractive urban design, and the provision of desired public spaces and other amenities shall be PUD objectives." *Id.* § 2400.2. "Compatibility with city-wide and neighborhood goals, plans, and programs" are also "goals of the PUD process." *Id.* § 2440.3.

The Association argues that the Commission's decision approving RWN's P.U.D. application is inconsistent with several of the specific requirements of the P.U.D. regulations. Petitioner focuses first on the "contiguous area" regulation, which provides that "[a]ll of the property included in a planned unit development shall be contiguous; Provided, that the property may be separated only by a public street, alley, or right of way." 11 DCMR § 2401.3 (1987). The P.U.D. application includes plans for the office building site as well as the hous-

ing amenity site, which are separated by over three blocks. Thus, the Association makes the facially plausible challenge that the P.U.D. application does not satisfy the Commission's contiguity requirement.

RWN maintains that the contiguity requirement of § 2401.3 should be construed as applying only to the main site of the P.U.D., and not to any off-site amenities. Thus, under RWN's interpretation, the off-site amenity is not considered to be part of "the property included in a planned unit development." Assuming that the Commission would concur in that interpretation,[13] the Association responds by pointing to other regulations which are inconsistent with RWN's construction of § 2401.3. In particular, the Association stresses the "incentive" regulations, which provide:

> 2400.6 In approving developments under the PUD process ... the Zoning Commission shall have the option to approve incentives, including increases in building heights and densities, to promote flexibility of development.

> 2400.7 In approving increases under § 2400.6, the Zoning Commission shall consider whether the application ... (c) provides *present and future occupants of planned unit developments* with a living or working environment and amenities superior to those that could be achieved by applying the other provisions of this title.

11 DCMR §§ 2400.6, 2400.7 (emphasis added). Under these regulations, the Commission is free to approve a P.U.D. application with increased building heights or densities, but in so doing the Commission must consider whether the application provides occupants of the P.U.D. with superior amenities. In the instant case, although RWN characterized its P.U.D. as a "superior design" with exemplary architecture, the Commission apparently relied solely on the off-site housing amenities in approving increases in height and density.[14] If, as

---

**13.** Although the Association raised all of these arguments below, the Commission's order does not explain how approving the P.U.D. application was consistent with the Commission's regulations. Thus, we are without the benefit of the

Commission's interpretation of these regulations in the context of a P.U.D. application that includes an off-site housing amenity component.

**14.** There is no indication in the Commission's order that any on-site elements of the applica-

RWN construes the regulations, the off-site housing is not part of the P.U.D. property, then the Commission approved RWN's application without relying on any amenities for occupants of the P.U.D. Thus, even under RWN's interpretation of § 2401.3, the Commission's decision to approve the P.U.D. would seem—at least facially—to run afoul of §§ 2400.6 and 2400.7.[15]

In view of the regulatory caveat that "the PUD process shall not be used to circumvent the intent and purposes of this title," 11 DCMR § 2400.5, and the regulation's requirement that the Commission focus on whether an application provides "occupants" of the P.U.D. in a contiguous area with superior amenities, the Commission must explain how its decision to approve an application containing only off-site amenities is consistent with the regulations. *See Dell v. District of Columbia Dep't of Employment Servs.*, 499 A.2d 102, 106 n. 2 (D.C.1985) (it is "axiomatic that an agency is bound by its own regulations"). It is true that the P.U.D. process must take into account an application's "[c]ompatibility with city-wide and neighborhood goals, plans, and programs," 11 DCMR § 2440.5, but this case poses the danger that in approving the application the Commission has allowed these larger goals to determine the P.U.D. process, at the expense of the site-focused requirements of the regulations.

We recognize that the Commission is free to regulate through contested case proceedings, *Capitol Hill Restoration Soc'y v. Zoning Comm'n*, 380 A.2d 174, 179–80 (D.C.1977), and thus was not bound to adhere to the letter of the contiguity and incentive regulations in this case. But when an agency does depart from the apparent plain meaning of its regulations, "the basis [for its decision] must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action...." *Securities and Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Thus, if on remand the Commission decides to interpret its regulations to account for off-site amenities, it must explain why (and how) it is doing so. Moreover, given the potential arbitrariness of off-site linkage, it would appear that the Commission would be well advised to promulgate regulations or procedures for approval of this type of off-site linkage. *See id.* at 202, 67 S.Ct. at 1580 ("[t]he function of filling in the interstices of [the regulations] should be performed, as much as possible, through the quasi-legislative promulgation of rules to be applied in the future").

## IV.

■ The Association contends further that RWN's P.U.D. is inconsistent with the Comprehensive Plan for the National Capital. The Commission's enabling statute provides that "[z]oning maps and regulations, and amendments thereto, shall not be inconsistent with the comprehensive plan for the nation's capital...." D.C.Code § 5–414 (1988); *see also* 11 DCMR § 2400.5 (1987) ("the PUD process shall not be used ... to result in action that is inconsistent with the Comprehensive Plan"). The Association points to language in the "Downtown Element" of the Comprehensive Plan, 10 DCMR §§ 900–99 (1989), stating the D.C. Council's policy that residential housing should be encouraged on the portion of Massachusetts Avenue in which the office building is located:

> The Mount Vernon Square area should be the primary location for Downtown

---

tion were grounds for its decision to allow increases in the height or density of the Massachusetts Avenue site. The Commission characterized the off-site housing as "a major amenity" in approving the application, and found that "the proposed [off-site] housing amenities provide an adequate trade-off for the proposed rezoning of the PUD site."

**15.** In addition, the application would seem to conflict with the minimum area requirements of § 2401.1, which provide that "[t]he total area included within the proposed development, ... shall be ... (a) A minimum of fifteen thousand square feet...." The office building site by itself occupies a total of 14,478 square feet. Although RWN asked for a waiver of the minimum area requirement, the Commission's order did not address the issue.

residential development. New housing should be along Massachusetts Avenue, N.W., and in mixed-use development to its south and east. *The area along Massachusetts Avenue, N.W., from 15th to 9th Streets, N.W., presents the need for a careful change from commercial to residential land use emphasis.* The area along Massachusetts Avenue, N.W., between Union Station and 7th Street, N.W., should retain its mixed use character.

10 DCMR § 900.53 (1989) (emphasis added); *see also id.* § 932.2(b) (stating the policy to "[g]ive special attention to the area along Massachusetts Avenue, N.W., from 9th to 15th Streets, N.W., in order to direct careful change from commercial to residential emphasis"); *id.* § 903.2(c) (stating the policy to "[f]acilitate mixed use development along Massachusetts Avenue, N.W., that emphasizes the residential component of that mix"). Indeed, the Association notes that the portion of Massachusetts Avenue between 9th and 15th Streets, N.W., is "the only street which the [Downtown] Element singles out by name for housing uses."

RWN responds that another portion of the Comprehensive Plan, the "Land Use" element, 10 DCMR §§ 1100–39 (1989), contains the "Generalized Land Use Map" which designates the area in which the office building site is located as mixed-use, high-density residential and high-density commercial. RWN also notes that the D.C. Council's most recent amendment to the Comprehensive Plan provided that "[s]ince the Land Use element integrates the policies and objectives of all other District elements, it should be given greater weight than the other elements." D.C.Law 8–129 at § 2(B)(i).

The Commission's order includes a bare conclusion that the proposed rezoning for the P.U.D. is not inconsistent with the Comprehensive Plan. There is no explanation for this conclusion. The Commission found that the Land Use map "shows the

PUD site as being included in the high density residential/high density commercial category," but the order does not include any discussion of the Downtown Element and its stated policy in favor of residential development on this portion of Massachusetts Avenue.[16] Given the somewhat murky language of the Downtown Element (the area should undergo "careful change from commercial to residential emphasis"), we cannot agree with the Association that the Commission's order is clearly inconsistent with the Comprehensive Plan. So extraordinary a provision in the Comprehensive Plan, however, directing a preference for residential development on this particular part of Massachusetts Avenue,[17] would appear to require that the Commission address this provision before approving a non-residential project on this particular site. On remand the Commission must therefore explain how the rezoning required by this P.U.D. application is not *inconsistent with the Comprehensive Plan as a whole.* A simple conclusory statement without explanation is insufficient. *See Dietrich v. District of Columbia Bd. of Zoning Adjustment,* 293 A.2d 470, 473 (D.C.1972) ("the agency [must] disclose[ ] the basis for its order by an articulation with reasonable clarity of its reasons for the decision"); *Perkins v. District of Columbia Dep't of Employment Servs.,* 482 A.2d 401, 402 (D.C.1984) (an agency decision's "conclusions of law must follow rationally from the findings" of fact).

## V.

█ Finally, the Association complains that the covenant relied upon by the Commission to assure that the off-site housing would remain residential was not made part of the record, and the Association was therefore unable to point out its deficiencies to the Commission. The order requires RWN to "record in the land records office of the District of Columbia a covenant for the 'O' Street housing linkage site

---

16. The Association and others in opposition to the P.U.D. application raised the objections before the Commission that the proposed rezoning would conflict with the Downtown Element.

17. Neither RWN nor the District has directed our attention to a similar provision elsewhere in the Comprehensive Plan. We have found none.

restricting the owners to using the property for nontransient residential use, only." The Commission did not require RWN to place a draft covenant on the record for the Association and the other parties to examine.[18] The Association made a timely objection before the Commission, asking that any covenant be made part of the record.

Twice recently the court has remanded cases for an agency to establish on the record the particular terms, conditions and legal effect of a covenant designed to ensure compliance with an agency order. *See Daro v. District of Columbia Zoning Comm'n*, 581 A.2d 295 (D.C.1990); *Committee of 100 on the Federal City v. District of Columbia Dep't of Consumer and Regulatory Affairs*, 571 A.2d 195 (D.C. 1990). In *Daro*, the Commission approved a zoning amendment on the condition that the applicant enter into a covenant that would "restrict[ ] the use, height, bulk, and set back of its property...." 581 A.2d at 304. Although the proposed covenant was part of the agency record, the court remanded "for the Commission 'to specify the terms, conditions and legal effect of the referenced covenant'...." *Id.* at 298 (quoting the court's order of November 6, 1989). Similarly, in *Committee of 100*, the Mayor's Agent authorized the demolition of an historic building, relying in part on a "covenant as an essential aspect of [the owner's] proposed project...." 571 A.2d at 205. The court remanded for

> further proceedings ... to flesh out the nature of the covenant ... since it is only during the course of the contested case proceedings that parties in opposition will have an opportunity to make their

concerns known and the applicant will have an opportunity to respond before the Mayor's Agent makes her final decision....

*Id.*

A remand is appropriate in the instant case, as well. RWN contends that the conditions in the Commission order itself will ensure compliance, and that the covenant merely "make[s] doubly sure that future owners will not eviscerate the public benefit" of the housing linkage. Even if RWN is correct, the Commission has nonetheless chosen to rely on a covenant to ensure that the housing amenities will continue to serve their intended function. Because the Commission determined that a covenant was necessary to ensure compliance, parties in opposition to the application (and parties in support of it) should be given an opportunity to examine the covenant and comment on any perceived deficiencies. Otherwise the right to a contested case proceeding would be undermined. *See Committee of 100, supra,* 571 A.2d at 205. On remand the Commission shall order that the proposed covenant be made part of the record, giving interested parties an opportunity to comment.

Accordingly, the case is remanded to the Commission for further proceedings consistent with this opinion.

---

**18.** Moreover, unlike the covenant for the office building site, which must be "satisfactory to the Office of Corporation Counsel and the Zoning Regulations Division of the Department of Consumer and Regulatory Affairs," the order appears to give RWN great freedom in drafting the "O" Street covenant.