*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 13-AA-366, 13-AA-367, 13-AA-368, 13-AA-369, 13-AA-370, 13-AA-371, 13-AA-372, 13-AA-373, 13-AA-374, 13-AA-375, 13-AA-376, 13-AA-377, and 13-AA-378

CHRISTOPHER S. HOWELL, *et al.*, PETITIONERS,

and

EASTERN MARKET METRO COMMUNITY ASSOCIATION, INTERVENORS,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

STANTON-EASTBANC LLC, *et al.*, INTERVENORS.

Petitions for Review of a Decision
of the District of Columbia Zoning Commission
(ZC-24-11)

(Argued September 26, 2013          Decided August 14, 2014)

*Oliver B. Hall* for petitioners and intervenor Eastern Market Metro Community Association.

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, filed a statement in lieu of brief for respondent.

*Vincent Mark J. Policy*, with whom *William C. Casano* and *Jacques B. DePuy* were on the brief, for intervenor Stanton-EastBanc LLC.

Before FISHER and MCLEESE, *Associate Judges*, and PRYOR, *Senior Judge*.

FISHER, *Associate Judge*:  On March 8, 2013, the Zoning Commission for the District of Columbia approved a zoning map amendment and an application for a planned unit development (PUD) at the site of the former Hine Junior High School.  Petitioners, thirteen neighbors of the Hine School site, and intervenor Eastern Market Metro Community Association (EMMCA) (collectively "petitioners") principally claim that the Commission (1) failed to appropriately address the significant height and mass of the development, (2) did not adequately evaluate the affordable housing component of the plan, and (3) neglected to examine the Land Disposition and Development Agreement (LDDA).  We affirm.

## I.    Background

After Hine Junior High School closed in 2008, the Deputy Mayor for Planning and Economic Development launched a competitive bid process for redeveloping the site.  On July 13, 2010, the Council of the District of Columbia approved the disposition of the property to the winning bidder, Stanton-EastBanc LLC.  During and after this process, the developer engaged community residents, business leaders, and civic organizations, seeking input on future use of the 3.16 acre site, which is across Pennsylvania Avenue from the Eastern Market

Metro Station. Stanton-EastBanc then submitted a PUD application and Zoning Map Amendment to the Zoning Commission.

The application proposed razing the school and constructing a large residential, office, and retail development in two buildings. The North Building would be entirely residential and contain only affordable housing, while the larger South Building would be mixed-use. Stanton-EastBanc also proposed creating a plaza between the two buildings and reopening a block of C Street that had been eliminated in the early 1960s to make room for a playground.

In hundreds of letters and dozens of appearances during three public hearings before the Zoning Commission, community members commented on the proposal.[1] Many residents, community groups, and businesses supported the project, including Advisory Neighborhood Commission 6B, which negotiated a Memorandum of Agreement (MOA) with Stanton-EastBanc. A significant number of local residents and organizations, including petitioners, opposed the project. Stanton-EastBanc eventually secured approval for the PUD from the Office of Planning (OP), the Department of Housing and Community Development

---

[1] Stanton-EastBanc noted in its brief that in addition to three evenings of testimony, the Zoning Commission received "493 exhibits." The majority of these exhibits were letters from the community supporting or opposing the project.

(DHCD), the Department of Transportation (DDOT), the Historic Preservation Review Board (HPRB), and the Deputy Mayor for Planning and Economic Development (DMPED). After hearing from all of these participants, the Zoning Commission approved the PUD design and the zoning change.

## II. The Zoning Commission's Role

The PUD process provides developers greater design and planning flexibility than may be possible under conventional zoning procedures. *See* 11 DCMR §§ 2400.2, .4 (2013). "A P.U.D. applicant generally requests that a site be rezoned to allow more intensive development, in exchange for which the applicant offers to provide 'amenities' or 'public benefits' which would not be provided if the site were developed under matter-of-right zoning." *Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 140 n.2 (D.C. 1991) (citing 11 DCMR § 2400.2). When evaluating a PUD application, the Zoning Commission is required to "judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8 (2013).

"Because of the Commission's statutory role and subject-matter expertise, we generally defer to the Commission's interpretation of the zoning regulations and their relationship to the [Comprehensive] Plan." *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1166-67 (D.C. 2013) (citations omitted). "[W]e must affirm the Commission's decision so long as (1) it has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) its conclusions of law follow rationally from those findings." *Id*. at 1167 (citations omitted). "Where the Commission has fully addressed the applicable aspects, policies, and material issues regarding the Plan, this court will not substitute its own judgment for that of the Commission." *Id*. at 1168 (citations omitted).

## III.   Height and Mass

The Hine School site was zoned R-4, which designates a residential area consisting of "row dwellings, conversions, and apartments." 11 DCMR § 105.1 (a)(4) (2013). This designation allows a maximum height of 40 feet and a

maximum floor area ratio (FAR) of 1.8.[2]  11 DCMR §§ 400.1, 402.2, 402.4 (2013).

Stanton-EastBanc sought to change the zoning of the site to C-2-B, defined as a

"medium-high density" commercial district.  11 DCMR § 105.1 (d)(2)(B) (2013);

*see* 11 DCMR §§ 720.6 to .8 (2013).  This designation permits buildings in a PUD

to be 90 feet in height and have a FAR of up to 6.0.  11 DCMR §§ 2405.1 to .2

(2013).  Stanton-EastBanc further requested that the Zoning Commission allow a

small part of the project to rise to 94.5 feet in order to accommodate an elevator.

*See* 11 DCMR § 2405.3 (a) (2013) (allowing for a 5% increase in height when

"essential to the successful functioning of the project").  The Commission granted

these zoning map amendments and approved the PUD despite testimony pointing

to the significant difference between the height and mass of the project and the

predominantly two- and three-story row houses in the historic community

surrounding it.

Petitioners argue that the Commission neither addressed concerns that "the

PUD will be more than twice as tall and more than twice as dense" as the site's

original zoning would have allowed, nor heard sufficient evidence to make such a

---

[2] "**Floor area ratio**—a figure that expresses the total gross floor area as a multiple of the area of the lot. This figure is determined by dividing the gross floor area of all buildings on a lot by the area of that lot." 11 DCMR § 199.1 (2013).

finding.[3] This is inaccurate. In fact, acknowledging that it was one of the primary objections to the project, the Zoning Commission addressed the height and mass of the PUD as the first contested issue under a heading entitled "Project Design, Scale (including Height) and Density." The Commission noted that "several persons and parties in opposition expressed objections to the project design, scale, and density." Despite these concerns, the Commission had "no reason to disagree with the several decisions of HPRB . . . that the Project is compatible with the Capitol Hill Historic District," and found that "the visual and other potential impacts from the

---

[3] Stanton-EastBanc argues that the thirteen petitioners (who were not parties below) and intervenor EMMCA lack standing to bring this claim, primarily arguing that they have not alleged a concrete injury. We disagree. "[T]o establish standing under the DCAPA to challenge an agency order, the petitioner must allege . . . that the interest sought to be protected . . . is arguably within the zone of interests protected under the statute or constitutional guarantee in question . . . and . . . [there must not be a] clear legislative intent to withhold judicial review . . . ." *District of Columbia Library Renaissance Project/W. End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107, 115 (D.C. 2013) (quoting *D.C. Appleseed Ctr. for Law & Justice, Inc. v. District of Columbia Dep't of Ins., Sec. & Banking*, 54 A.3d 1188, 1200 (D.C. 2012)). We hold that petitioners have asserted a concrete injury as to all three claims. *See id*. at 115-16 n.4 ("For example, if a neighborhood organization claimed that failure to enforce compliance with the [Inclusionary Zoning] regulations would harm its members' interests in a diverse neighborhood, that allegation would presumably bring the organization and its members directly within the zone of interests of the IZ regulations."); *Dupont Circle Citizens Ass'n v. Barry*, 455 A.2d 417, 421-22 (D.C. 1983) (holding that neighborhood residents had standing to challenge new building based on its threat to the historic character of their neighborhood because "threats to the use and enjoyment of an aesthetic resource may constitute an injury in fact").

scale and density of the Project have been mitigated and are not unreasonable given . . . the character of the surrounding area."[4]

Addressing the maximum height of 94.5 feet, the Commission found "that the additional height 'is essential to the successful functioning of the Project and consistent with the purpose and evaluation standards of this chapter.'" Quoting 11 DCMR § 2405.3 (2013). Concluding its analysis, the Commission explained "that the density and height of the PUD is appropriately dispersed on the PUD site as it appropriately relates to existing townhomes. The scaling down of the height of the Property is appropriate given its relationship to adjacent buildings and uses."

---

[4] Petitioners contend that we should conduct "a stricter review of the record" because much of the Commission's order "was adopted verbatim from the proposed findings of fact and conclusions of law submitted by Stanton-EastBanc." Although many of the developer's proposed findings in this case were adopted verbatim by the Commission, substantial changes were made as well, and "we see no reason to doubt that the Commission's findings and decision represent its own considered conclusions." *Watergate E. Comm. Against Hotel Conversion to Co-op Apartments v. District of Columbia Zoning Comm'n*, 953 A.2d 1036, 1045 (D.C. 2008) (citations omitted). "We therefore apply our normal standard, reviewing to ensure that the challenged findings are supported by substantial evidence." *Id.*

These findings were supported by substantial evidence.[5] This evidence is highlighted by commissioners' remarks during the hearings that "there was substantial support" for the project's density and that "the density is appropriate and in the long run will be a benefit to the neighborhood and the city as a whole." Although the record contains many objections to the project's size, it is also replete with evidence upon which the Zoning Commission based its conclusion to the contrary. We therefore reject petitioners' claim.

## IV.  Affordable Housing

The District of Columbia's Inclusionary Zoning (IZ) Program requires that new residential building projects of a certain size reserve units for affordable housing. 14 DCMR § 2200.2 (2013). Federal Low Income Housing Tax Credit (LIHTC) is available to developers who build sufficient qualifying affordable housing. 26 U.S.C. § 42 (2013); *see* 10-B DCMR §§ 3402 (2013). When a project is subsidized by LIHTC, it is exempt from the IZ Program (and thus from many IZ

---

[5] Among many examples, a representative from the D.C. Preservation League explained that "[t]he project's 21st Century design is compatible with adjacent construction, nearby historic structure[s] and metrocentric walkable urban planning." ANC Commissioner Brian Pate, testifying in support of the project, said that some of the ANC's initial concerns about the PUD's height had been mitigated by negotiations that resulted in the removal of "the setback floor of the Office Building's top floor."

requirements) if (1) it provides at least the same amount of affordable housing as the IZ Program would have required, (2) the affordable units are reserved "for so long as the project exists," and (3) both obligations are stated as declarations in a covenant approved by the District and recorded in the land records. 11 DCMR §§ 2602.3 (f), 2602.7, 2602.8 (2013).

The Hine School project, as proposed, will be exempt from the IZ Program. As an alternative to participating in the IZ program, the developer plans to provide affordable housing through the LIHTC program, which is administered by the District's Department of Housing and Community Development (DHCD). Petitioners raise three arguments concerning this proffered affordable housing.

## A. Amount of Affordable Housing

In an argument raised for the first time in their reply brief, petitioners contend that the Commission failed to find that the PUD would provide the gross floor area (GFA) of affordable housing that would have been required by the IZ Program. Even if we consider this claim,[6] it fails.

_____

[6] EMMCA, as a party below, could have raised the GFA issue before the Commission. 11 DCMR §§ 3020.2, 3022.8 (i) (2013). When the Commission's

(continued…)

As discussed above, we will affirm the Zoning Commission's decision if "(1) it has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) its conclusions of law follow rationally from those findings." *Durant*, 65 A.3d at 1167. Under the IZ Program, the Hine School site would have been required to reserve at least 8% (and perhaps 10%) of the GFA of its residential space for affordable housing. 11 DCMR § 2603 (2013). Before the Zoning Commission, Stanton-EastBanc proffered that the proposed PUD would reserve 13% of its residential GFA and 29% of its total units for affordable housing. Without specifically addressing the GFA of the Hine project, the Commission found that setting aside 29% of the units as affordable housing would "substantially exceed what the IZ program would have required." Although it declined to describe the affordable housing component as "superior," the Commission concluded that the PUD application

---

(…continued)
order became final, EMMCA had the right to file for "reconsideration, rehearing, or re-argument" within ten days if it believed that the Commission had failed to address or had incorrectly calculated the GFA. 11 DCMR § 3029.5 (2013). It did neither. Moreover, "[i]t is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief." *Gathy v. United States*, 754 A.2d 913, 916 (D.C. 2000) (quoting *Stockard v. Moss*, 706 A.2d 561, 566 (D.C. 1997)).

"satisfied the requirement of § 2403.10."[7] The Commission should have made an explicit finding about GFA, but petitioners have failed to show that its more general finding, that the amount of affordable housing exceeds "what the IZ program would have required," is not supported by substantial evidence.

## B. Duration of Affordable Housing

Petitioners also claim that because the affordable housing proffered by the Hine School project will "expire after a period of forty years," it fails to meet another one of the requirements for exemption from the IZ Program. The Commission did not conclusively state when the affordable housing would expire,[8]

---

[7] Section 11-2403.10 of the District of Columbia Municipal Regulations provides that "[a] project may qualify for approval by being particularly strong in only one or a few of the categories in § 2403.9 [listing categories of public benefits and project amenities], but must be acceptable in all proffered categories and superior in many." One enumerated benefit is "the extent [to which the affordable housing provided by the PUD] exceeds what would have been required through matter of right development under existing zoning." 11 DCMR § 2403.9 (f) (2013).

[8] In its order, the Commission notes that, according to the Zoning Administrator's letter, "the development must still provide the same affordable housing set-aside as would have been reserved under Inclusionary Zoning for so long as the development is in existence." (Citing 11 DCMR § 2602.7 (2013)). Later, it adds that "[t]he North Building units shall be affordable for a period of 40 years . . . . The South Building units will be affordable for so long as the Project exists." Despite this apparent contradiction, the Commission's

(continued…)

however, nor did it find that the PUD would be exempt from the IZ Program.[9] But the Commission was not required to do either. These determinations will be made when the developer applies for a building permit and certificate of occupancy. *See* 11 DCMR § 2602.7 (d) ("[t]he approved covenant [for the required quantity and duration of the affordable housing] shall be recorded . . . prior to the date that the first application for the certificate of occupancy is filed for the project"); 12 DCMR § 110A.1.6 (2007) ("After the code official inspects the building or

---

(…continued)
examination of the duration of the affordable housing proffered was sufficient. It weighed the affordable housing benefit with the understanding that the North Building's units would remain affordable for forty years. Because the affordable housing will be provided for at least that long, there is no need for the Commission to re-weigh the benefits of the PUD to account for a longer duration of affordable housing.

[9] In footnote 2 of its order, the Commission cites a determination letter from the ZA which states that the PUD will become exempt from the IZ Program "upon compliance with the requirements of [11 DCMR §§] 2602.7 and 2602.8." These regulations require the project to provide at least the same amount of affordable housing as the IZ Program would have required, to reserve those units "for so long as the project exists," and to declare those obligations in a covenant approved by the District and recorded in the land records. 11 DCMR § 2602.7 (2013). Furthermore, the developer must provide the ZA with "written certification from the DHCD Director that the development meets the [first of these two] requirements[.]" 11 DCMR § 2602.8 (2013). The ZA's letter also explains that his determination "is also subject to compliance . . . with the requirements of [11 DCMR §] 2602.3(f) at the time of the issuance of a building permit for construction[.]" As applicable here, this regulation requires Stanton-EastBanc to demonstrate that the project's affordable housing is financed, subsidized, or funded by the federal or District government through the LIHTC program administered by DHCD. *See* 11 DCMR § 2602.3(f) (2013).

other structure and finds no violations of the provisions of the Construction Codes, Zoning Regulations or other laws that are enforced by the Department [of Consumer and Regulatory Affairs], the code official shall issue a certificate of occupancy[.]"). Thus, it was not necessary for the Commission's order to address whether the Hine School project, as proffered, will be exempt from the IZ program.

## C. Segregation of Affordable Housing

Petitioners further argue that the affordable housing proposed for the Hine School site will be "segregated" in the North Building, "contraven[ing] whole sections of Chapter One of the Comprehensive Plan." Despite this claim, the proposed PUD complies with the only section of the Comprehensive Plan petitioners cite. *See* 10-A DCMR § 218.3 10 (2013) ("[T]he production of new affordable housing . . . [is] essential to avoid a deepening of racial and economic divides in the city. Affordable . . . housing production and preservation is central to the idea of growing more inclusively."). Moreover, even though this project, as proposed, will be exempt from the IZ Program, petitioners focus on several IZ Program regulations it claims that this PUD will violate.

The segregation claim was comprehensively examined by the Zoning Commission. In its initial report to the Commission, the OP raised concerns about the concentration of affordable housing in the North Building, explaining that these "units normally should be integrated into a total mixed income project and not separated out as they happen to be here." To mitigate these concerns, the OP recommended that Stanton-EastBanc "take steps to assure that the design and materials used on the North Building have the same level of quality and finish that the South Building will have to make visually clear that both buildings are in the same project and have the same level of design and construction." During the hearings, commissioners favored a "mixed income building," but agreed with OP that if a separate building entirely comprised of affordable housing was necessary, it would have to appear as though it was a part of the rest of the development.

Stanton-EastBanc amended its plans to address these concerns, changing the North Building's materials and design elements. In its order, the Commission noted with approval that Stanton-EastBanc had taken their comments into consideration and "incorporated them into a revised design." A commissioner explained that after these changes, the North Building "integrates better with the rest of the development," particularly because he viewed the plaza between the buildings as "a connecting element, not a separating element." Furthermore, the

developer produced evidence that financiers were unwilling "to combine the financing of low-income housing tax credits and bonds with conventional debt and equity." Noting "a severe crisis of affordability in this city," one commissioner accepted the affordable housing plan because it provided a significant number of affordable units and he understood the financing concerns. Another commissioner did not "think this is as big an issue as it might be . . . . [W]e've seen a number of projects where we have an affordable component that is an independent building for senior housing." The record thus demonstrates that the Commission weighed the pluses and minuses of the affordable housing component. After careful consideration, the Commission was "satisfied" that "the North Building will have noteworthy amenities, will be ADA accessible and . . . [will] offer high-quality architecture and materials, superior to those typically seen in affordable housing projects." We will not disturb its decision.[10]

## V.    The LDDA

_____

[10]    Although petitioners claim that the entire basis for the Commission's approval of the "segregated" affordable housing rests upon two "informal e-mails," this is not an accurate portrayal of the record. This issue was examined at several of the hearings and many factors went into the Commission's analysis.

In July of 2010, the Council of the District of Columbia passed a resolution authorizing the sale and lease of different portions of the Hine School site to Stanton-EastBanc. This resolution was accompanied by a term sheet and a draft Land Disposition and Development Agreement (LDDA). *See* D.C. Code §§ 10-801 (b-1)(2), (b-1)(5)(A)(i) (2013 Repl.) (establishing requirements for sale or lease of public land). The term sheet indicated that the ground rent of the leased portion of the site would be calculated by deducting "the cost of providing District-mandated affordable housing, environmental remediation, and any extraordinary or off-site proffer as required by the PUD to redevelop the property." Such terms establish requirements for the final agreement. *See* D.C. Code § 10-801 (b-1)(6)(A) (2012 Repl.) ("If a substantive change is made to the term sheet . . . after the resolution was transmitted to and approved by the Council . . ., a resolution describing the change accompanied by an amended term sheet . . . in redline format shall be transmitted to Council for a 30-day period of review . . . ."). Stanton-EastBanc and the Deputy Mayor for Planning and Economic Development entered into an LDDA on October 27, 2010, setting out the terms of the sale and lease of the Hine School site.

Petitioners raise two issues concerning the LDDA. First, they contend that their due process rights were violated because various proffers and representations

made by the developers referred to the LDDA or the related affordable housing covenant. Indeed, petitioners point out, the PUD application specifically requests zoning changes "in order to accommodate the public policy objectives . . . sought by the District of Columbia through" the LDDA. They argue that the Commission's order therefore relied on the LDDA although that document is not in the record. Second, they claim that the Commission's failure to examine the LDDA prevented it from discovering that the cost of many of the benefits and amenities proffered by the developer was being deducted from the ground rent for the land. Petitioners thus argue, in effect, that the amenities proffered by the developer will actually be paid for by taxpayers. They ask us to remand for further proceedings in which the LDDA will be disclosed to them and examined by the Commission.[11]

**A. Due Process**

---

[11] Petitioners have submitted several post-argument letters, purportedly pursuant to D.C. App. R. 28 (k). To one they attached a copy of a ground lease executed on July 10, 2013, between the Deputy Mayor and 700 Penn LLC, assignee of Stanton-EastBanc's rights and obligations under the LDDA. We have not considered this lease because it is not part of the record and was executed after the Commission issued its order.

The most notable feature of this argument is that petitioners failed to demand production of the LDDA or the covenant when this PUD application was before the Commission. "In the absence of exceptional circumstances, this court will not entertain contentions not raised before the agency." *Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 33 (D.C. 1992) (citations omitted). Nevertheless, we "may show a measure of flexibility in this regard when the interests of justice so require." *Goodman v. District of Columbia Rental Hous. Comm'n*, 573 A.2d 1293, 1301 (D.C. 1990). We therefore will briefly examine the merits of petitioners' claim.

Although the LDDA is mentioned six times in the Commission's order, we have seen no evidence that the Commission examined or relied on it. Three of these references mention the LDDA when describing the process which led to the application. A fourth mention of the LDDA was made in response to "objections and concerns with the Applicant having used a 'bait and switch' tactic" by significantly changing the plans before submitting the PUD application. The Commission noted that "[t]he project must be developed in accordance with the plans approved by the Commission and the conditions of approval," and concluded that any inconsistencies between the approved plans and "any other agreements is for the parties to those agreements to determine and, if necessary[,] resolve." It

was in this context that the Commission's order states, "[w]hether the plans approved for the PUD are inconsistent with the terms of the LDDA is irrelevant to the Commission's consideration." *Cf. Watergate E. Comm. Against Hotel Conversion to Co-op Apartments v. District of Columbia Zoning Comm'n*, 953 A.2d 1036, 1043 n.6 (D.C. 2008) ("The Zoning Commission does not have authority to settle a contract dispute.").

The final two references to the LDDA in the Commission's order simply use the date of recording of the affordable housing covenant, "which is required by the District of Columbia Government to be executed by the Applicant pursuant to the Land Disposition and Development Agreement ("LDDA")," as the starting point of a forty-year obligation. Each of these passages alludes to the existence of the LDDA, but none relies on its substance. There is nothing to suggest that the Commission ever saw the LDDA, much less that it violated due process by substantively relying on a document that Stanton-EastBanc hid from petitioners.

Relying on a prior opinion of this court, petitioners contend that this case must be remanded so that they may examine the LDDA and the affordable housing covenant for themselves. *See Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 148 (D.C. 1991). In *Blagden Alley*, we remanded an order

approving a PUD "[b]ecause the Commission determined that a covenant was necessary to ensure" that off-site affordable housing amenities would be provided, and we believed that "parties in opposition to the application . . . should be given an opportunity to examine the covenant and comment on any perceived deficiencies." *Id.* Here, the Commission did not simply rely on Stanton-EastBanc's promise to record a covenant. Instead, it ordered that "[n]o building permit shall be issued for the approved PUD until the Applicant has recorded a covenant in the land records of the District of Columbia that is satisfactory to the Office of the Attorney General and Department of Consumer and Regulatory Affairs ('DCRA')." *Cf. Blagden Alley*, 590 A.2d at 148 n.18 ("[U]nlike the covenant for the office building . . . , which must be 'satisfactory to the Office of Corporation Counsel and the Zoning Regulations Division of the [DCRA],' the order appears to give [the developer] great freedom in drafting the . . . [affordable housing] covenant"). Further ensuring compliance in this case, the requested zoning change does not become effective until "the recordation of the covenant." *See* 11 DCMR § 3028.9 (2013).

Perhaps more importantly, in *Blagden Alley* "[t]he Association made a timely objection before the Commission, asking that any covenant be made part of the record." 590 A.2d at 148. No similar request was made here. "We do not

discern here the kind of manifest injustice which would warrant either reversal of the agency's decision or a remand for further proceedings, where the request for such relief is predicated on a theory which the Commission has never had any occasion to address." *Goodman*, 573 A.2d at 1303.[12]

## B. Assessment of Benefits and Amenities

Petitioners' second claim related to the LDDA and the term sheet, that amenities proffered by the developer will actually be paid for by taxpayers, likewise is raised for the first time on appeal.[13] The Commission's task is to

---

[12] The information that petitioners complain has been hidden from them has been publicly available for years. The term sheet and draft LDDA with an attached "affordable housing covenant" were posted online by the District of Columbia as part of a report from the Committee on Economic Development supporting the Council's adoption of the resolution of approval on July 13, 2010. *See* Council of the District of Columbia Committee on Economic Development, *Report on Proposed Resolution 18-963, the "Hine Junior High School Disposition Approval Resolution of 2010*," http://dcclims1.dccouncil.us/lims/ (search by legislation number for "PR18-963" and follow "Committee Report" hyperlink). Petitioners could have secured these 2010 documents and presented them to the Commission at its public hearings in June and July of 2012. At a minimum, they could have asked the Commission to require that these documents be made a part of the record.

[13] If this issue was raised before the Commission, it was only by implication. Petitioners direct us to two quotes in the thousands of pages of testimony and exhibits submitted to the Commission. Each quote is from testimony questioning the general financial underpinnings of the project, but

(continued…)

"judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8 (2013). In their appellate briefs, the parties disagree about the definition of "development incentives," but it is clear from the record that the Commission understood this term to refer to the flexibility the developer requested through the proposed map amendment and zoning change. Because petitioners did not ask the Commission to accept their interpretation of "development incentives," we decline to address this issue for the first time on appeal.[14]

---

(…continued)
neither mentions the LDDA. It is therefore unsurprising that the Commission's Order does not mention the LDDA in this context. *See Watergate E. Comm. Against Hotel Conversion*, 953 A.2d at 1044 ("Our consideration of a claim raised for the first time on appeal deprives the administrative agency of its right to consider the matter, make a ruling, and state the reasons for its action . . . .") (quoting *Hill v. District of Columbia Dep't of Employment Servs.*, 717 A.2d 909, 912 (D.C. 1998)).

[14] EMMCA did claim below that the benefits and amenities provided here were not worth as much as those in previous PUD applications. Addressing this point, one commissioner commented, "I don't see a need to get into a specific dollar-for-dollar comparison to another project which faced its own unique circumstances." Under 11 DCMR § 2403.8, there is no requirement that the Commission compare the benefits offered by one PUD to those provided by another.

We do note, however, that the petitioners in *District of Columbia Library Renaissance Project/W. End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107 (D.C. 2013), raised a similar issue before the Commission, claiming that the financial concessions made by the District in connection with the land transfer should be treated as either an "adverse effect" or a "development incentive." *Id.* at 120, 122. Addressing that claim in an order published on April 27, 2012, a few months before the hearings in this matter, the Commission specifically declined to "second guess the calculations that led the District . . . to conclude this was a good deal." *Id*. at 120.

There, we deferred to the Commission's interpretation of its own regulations, noting, among other things, that the "assessment of the financial underpinnings of the underlying land transfer does not fall within the core of the Commission's expertise in land-use matters." *Id*. at 120; *see also id*. at 122 (holding that although the Commission is not "necessarily precluded from regulating or considering non-traditional subjects of zoning," it is "permitted to decline to consider the value of the land as an adverse effect"). We have no

equivalent declination from the Commission in this case for the simple reason that it was not asked to consider the issue.[15]

Petitioners also claim that "[n]ot once in the entirety of its 69-page order does the Commission address 'the degree of development incentives' granted to Stanton-EastBanc.'" This is incorrect. The Commission's order cites Stanton-EastBanc's six requests for "flexibility from the requirements of the Zoning Regulations" in a two-page section entitled "Flexibility Requested." In the subsequent eleven-page section, entitled "Project Benefits and Amenities," there is a discussion of the PUD's benefits and amenities. After these factual findings, the

---

[15] Petitioners argue that the Commission should have and would have assessed the project amenities differently had it known that the District of Columbia was actually funding some of those amenities. *See District of Columbia Library Renaissance Project*, 73 A.3d at 122 (where appellants argued that because "the public benefits provided by the PUD are required under the terms of [the developer's] contract with the District of Columbia, and have already been 'paid for' by the District of Columbia, . . . [the Commission] was 'double-counting' . . . to consider [the project amenities] as public benefits under the PUD regulations"). We do not find that argument to be a basis for relief in this proceeding, given petitioners' failure to bring the issue to the Commission's attention even though the critical information upon which petitioners rely appears to have been publicly available. See *supra* note 12. Moreover, we have previously upheld the Commission's decision not to consider similar arguments in the past. *See District of Columbia Library Renaissance Project*, 73 A.3d at 122-23. ("[H]av[ing] already concluded that the Commission was permitted to decline to consider the [terms of the underlying land transfer] as an adverse effect [or a development incentive], . . . the question of whether the District of Columbia 'paid twice' for the [project amenities] is simply a variant of the same general idea.").

Commission concluded that "the project amenities and public benefits of the Application are a reasonable tradeoff for the zoning flexibility." This is exactly the type of weighing that 11 DCMR § 2403.8 appears to envision.

## VI. Conclusion

The Order of the Zoning Commission is hereby

*Affirmed.*