**D.C. LIBRARY RENAISSANCE PROJECT/WEST END LIBRARY ADVISORY GROUP, Petitioner,**

v.

**DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent,**

and

**Eastbanc–W.D.C. Partners, LLC, Intervenor.**

**No. 12–AA–1183.**

District of Columbia Court of Appeals.

Argued Feb. 14, 2013.

Decided Aug. 8, 2013.

an order suspending respondent from the practice of law in the District of Columbia.

Oliver B. Hall for petitioner.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, filed a statement in lieu of brief in support of intervenor.

Deborah B. Baum, with whom Alison B. Rousseau, Washington, DC, was on the brief, for intervenor.

Before BECKWITH and McLEESE, Associate Judges, and RUIZ, Senior Judge.

McLEESE, Associate Judge:

EastBanc–W.D.C. Partners, LLC ("EastBanc") applied to the District of Columbia Zoning Commission for relief from certain zoning requirements as part of approval of a planned unit development ("PUD"). The proposed development includes a new public library, as well as retail and residential uses. The West End Library Advisory Group ("WELAG") is a non-profit association organized to protect the West End Library, which would be demolished and replaced as part of the PUD. WELAG opposed the project and participated as a party in the Commission proceedings. After the Commission approved the PUD application, WELAG unsuccessfully sought rehearing and then petitioned this court for review. We affirm.

## I.

The District of Columbia government decided to replace the current library and fire station in the West End, because the facilities had become obsolete. The Office of the Deputy Mayor for Planning and Economic Development ("DMPED") developed a plan to fund the construction of a new library and fire station through a land transfer. EastBanc submitted the winning bid proposal for the project.

The D.C. Library Renaissance Project ("DCLRP"), an organization dedicated to protecting the D.C. public library system, formed WELAG in 2006 because of its concerns about the plans to replace the West End Library. WELAG, DCLRP, and their members assisted at rallies, attended community meetings held by East-Banc and DMPED, and participated in Advisory Neighborhood Commission meet-

ings to voice their opinions about the project.

In 2010, the Council of the District of Columbia adopted a resolution approving a land-transfer agreement between East-Banc and the D.C. government, subject to, among other conditions, approval by the Zoning Commission. D.C. Council Res. 18–553, 57 D.C.Reg. 7623, 7624 (Aug. 20, 2010); D.C. Council Comm. on Econ. Dev., Rep. on Proposed Res. 18–959, at 17 (July 12, 2010) (Term Sheet specifying conditions of closing land sale). The Council later enacted the West End Parcels Development Omnibus Act of 2010, 58 D.C.Reg. 991, 992 (Feb. 4, 2011), which authorized the project to move forward.

As planned, the proposed project would be located on four lots, three of which are currently owned by the District of Columbia. The PUD application that EastBanc submitted includes plans for a proposed building that would be located on three of the lots and would contain a new public library and retail space on the ground floor and residential space on the higher floors. Ultimately, the project would also include a building on the fourth lot, which would house a fire station and residential units.[1] Ownership of the three lots that are now owned by the District of Columbia would transfer to EastBanc, and EastBanc in turn would construct the new library and fire station. The District would retain ownership of the air rights occupied by the new library and fire station. *See* Res. 18–553, § 2(6), 57 D.C.Reg. at 7624 (defining "property" as three lots, "less the air rights necessary to . . . replace the existing West End Library, the air rights necessary to replace the existing West End Fire Station, and . . . other such property rights . . . that are necessary or convenient for the support and operation of the new library and new fire station. . . ."); West End Parcels Development Omnibus Act, § 2(6) (incorporating land-transfer agreement approved in Resolution 18–553).

In the PUD application, EastBanc sought relief from height, density, area, and other zoning requirements. EastBanc also requested relief from Inclusionary Zoning ("IZ") requirements, 11 DCMR § 2600 et seq. (2012), which otherwise would have mandated that a portion of the new residential space be reserved for affordable housing units.

During the PUD process, the Commission accepted written submissions and took oral testimony at two hearings. WELAG opposed the project, arguing among other things that the PUD violated the IZ requirements and conflicted with policies in the District of Columbia Comprehensive Plan.[2] 10–A DCMR § 100 et seq. (2012) (Westlaw).

In its order approving EastBanc's PUD application, the Commission determined that the PUD was "particularly strong" in a number of areas, such as design and

---

**1.** EastBanc did not request zoning relief with regard to the building that would contain the fire station, so detailed plans for that building were not included in the PUD application.

**2.** The District of Columbia Home Rule Act authorizes the Mayor to prepare and implement comprehensive land-use plans for the city. D.C.Code § 1–204.23(a) (2001–2012); D.C.Code § 2–1002(a)(2) (2001–2012). "[T]he Comprehensive Plan is a broad framework intended to guide the future land use planning decisions for the District." *Tenley &*

*Cleveland Park Emergency Comm. v. District of Columbia Bd. of Zoning Adjustment,* 550 A.2d 331, 337 (D.C.1988). The first Comprehensive Plan was enacted by the District of Columbia Council in 1984. *See* District of Columbia Comprehensive Plan Act of 1984, D.C. Law 5–76, 31 D.C.Reg. 1049 (March 9; 1984). The Mayor and the Council periodically amend the Plan. *See, e.g.,* Comprehensive Plan Amendment Act of 2006, D.C. Law 16–300, 54 D.C.Reg. 924 (Feb. 2, 2007).

architecture, use of land, transportation and traffic, and special value to the neighborhood, and that it was "acceptable" in the category of housing and affordable housing. The Commission concluded that the public benefits and amenities of the PUD warranted the requested relief from zoning requirements, and that those benefits would not be obtained unless the requested relief were granted. Finally, the Commission found that the PUD was not inconsistent with the Comprehensive Plan.

## II.

As a threshold matter, EastBanc challenges WELAG's standing to seek judicial review of the Commission's order. WELAG participated as a party in the Commission proceedings, but that does not necessarily mean that WELAG has standing for purposes of judicial review. *See Goto v. District of Columbia Bd. of Zoning Adjustment,* 423 A.2d 917, 921 n. 8 (D.C.1980) ("Administrative appeals do not necessarily depend on the elements of standing that judicial review would require."); *PepsiCo., Inc. v. FTC,* 472 F.2d 179, 186 (2d Cir. 1972) ("The notion that being a 'party' before an agency either automatically confers or is a necessary condition of the right to judicial review [is incorrect].''). Accordingly, this court must determine in the first instance whether WELAG has standing to seek review in this court of the Commission's order.

This court has "followed Supreme Court developments in constitutional standing jurisprudence ... and [has] generally applied prudential limitations on the exercise of our jurisdiction." *Grayson v. AT & T Corp.,* 15 A.3d 219, 233–34 (D.C.2011) (en banc). We conclude that WELAG has standing to assert all of its claims.

## A.

■ The requirements of constitutional standing are: (1) injury in fact, (2) that is fairly traceable to the challenged action, and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *Accord, e.g., Grayson,* 15 A.3d at 246. An organization or association "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1207 (quoting *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

■ WELAG's members have adequately alleged injury in fact. To meet this requirement, an alleged injury must be "real, perceptible, concrete, specific and immediate, rather than ... conjectural, hypothetical or speculative." *Lee v. District of Columbia Bd. of Appeals Review,* 423 A.2d 210, 217 (D.C.1980). As previously noted, WELAG was organized to protect the West End Library. WELAG alleges that implementation of the PUD would cause its members to lose the use and enjoyment of the current library and that the replacement library would be inadequate. Specifically, one WELAG member stated that she has used the West End Library for almost thirty years and expressed concern that the proposed replacement library would lack adequate facilities. Such an allegation of specific and concrete interference with the use and enjoyment of a recreational or aesthetic resource suffices to support a conclusion of injury in fact. *See, e.g., Dupont Circle Citizens Ass'n v. Barry,* 455 A.2d 417, 421–22 (D.C.

1983) (allegation by neighborhood residents that proposed new building would undermine historic character of neighborhood adequate to support conclusion of injury in fact; "threats to the use and enjoyment of an aesthetic resource may constitute an injury in fact").

In arguing that WELAG has failed to adequately allege injury in fact, EastBanc relies heavily on *York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n (YATA)*, 856 A.2d 1079 (D.C. 2004). We do not view *YATA* as inconsistent with a conclusion that WELAG has adequately established injury in fact. The petitioners in *YATA* alleged injuries that were similar in character to injuries that we have in other settings found adequate to confer standing. *Compare YATA*, 856 A.2d at 1085 (plaintiffs alleged that construction of mixed dormitory-classroom structure across street from their homes would affect "quiet enjoyment of their homes" and "livability of their neighborhood"), *with Downtown Cluster of Congregations v. District of Columbia Bd. of Zoning Adjustment*, 675 A.2d 484, 490–91 (D.C.1996) (association of churches had standing, where three member churches were located within two blocks of property at issue and association alleged that use variance would affect character of neighborhood, be adverse to maintaining "living downtown," and threaten churches' membership and programs), *and Dupont Circle*, 455 A.2d at 419, 421–22 (association of resident property owners in Dupont Circle Historic District had standing, where association alleged that proposed building design would harm character of historic district); *see also Tiber Island Coop. Homes, Inc. v. District of Columbia Zoning Comm'n*, 975 A.2d 186, 192 n. 6 (D.C.2009) (noting, in dicta, that "our case law recognizes that neighbors whose everyday views would be affected by a proposed development are precisely the sort of people who have a sufficiently concrete and particularized interest in a zoning project to have standing to challenge that project in this court"). The court in *YATA* concluded, however, that the petitioners had not adequately alleged injury in fact, because the alleged harms were speculative and asserted "without explication." *Id.* at 1085. Here, it is neither speculative nor conclusory to suggest that WELAG members' use and enjoyment of their neighborhood library would be adversely affected if that library were demolished and replaced by a new library that WELAG alleges would lack adequate facilities.

■ WELAG's alleged injury is also traceable to the Commission's order approving the PUD, because EastBanc's plan to demolish and replace the library is contingent on that approval. For the same reason, the alleged injury is capable of being redressed by a favorable decision of this court. The alleged injury is also plainly relevant to WELAG's organizational purpose of protecting the West End Library. Finally, WELAG's legal claims and its requested relief—remand to the Commission for further proceedings—do not require its members to participate as parties in this appeal. We therefore conclude that WELAG has adequately established constitutional standing.

**B.**

■ Under prudential standing requirements, a plaintiff "may not attempt to litigate generalized grievances, and may assert only interests that fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Community Credit Union Servs. v. Federal Express Servs.*, 534 A.2d 331, 333 (D.C.1987) (internal quotation marks omitted). In addition, a plaintiff must generally "assert only its

own legal rights." *Id.* An association, however, can establish standing without asserting injury to itself, if it meets the requirements of associational standing, as WELAG does. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."); *Speyer v. Barry,* 588 A.2d 1147, 1160 & n. 25 (D.C.1991) (citizens' association satisfied prudential standing requirements where at least one of its members satisfied requirements).

### 1.

WELAG's alleged injuries are not generalized grievances. Demolition and replacement of the West End Library would "not fall indiscriminately upon every citizen," but rather would adversely affect only those who use the library. *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (indicating that users of national park would be injured in fact by aesthetic and recreational effects of building road and ski resort).

### 2.

▇▇▇ WELAG also has alleged injury to an interest that is "arguably within the zone of interests to be protected or regulated by the statute … in question." [3] *Lee,* 423 A.2d at 216. "[T]o establish standing under the DCAPA to challenge an agency order, the petitioner must allege … that the interest sought to be protected … is arguably within the zone of inter-

ests protected under the statute or constitutional guarantee in question … and … [there must not be a] clear legislative intent to withhold judicial review…." *D.C. Appleseed Ctr. for Law & Justice, Inc. v. District of Columbia Dep't of Ins., Sec. & Banking,* 54 A.3d 1188, 1200 (D.C.2012) (footnote and internal quotation marks omitted). The zone-of-interests requirement must be met separately for each claim. *See, e.g., Marshall & Ilsley Corp. v. Heimann,* 652 F.2d 685, 693 (7th Cir.1981) ("We apply the zone of interests analysis separately to each count and each statute asserted."). The zone-of-interests requirement is not "especially demanding," and the plaintiff need not be an intended beneficiary of the statute. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *see also Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,* —— U.S. ——, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) ("[W]e have always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff."). The zone-of-interests requirement will not be met, however, if the plaintiff's asserted interests are only "marginally related to or inconsistent with" the pertinent statutory or regulatory purpose. *Id.*

▇▇▇ The zone-of-interests requirement is most directly met when a single provision both arguably protects the plaintiff's interests and serves as the basis for the plaintiff's legal claim.[4] *See, e.g., Har-*

---

3. We have no reason to discuss here whether the standard for statutory standing under the District of Columbia Administrative Procedure Act, D.C.Code § 2–501 et seq. (2001–2012), is less stringent than or identical to the standard under the federal Administrative Procedure Act, 5 U.S.C. § 551 et seq. (2011). *Compare D.C. Appleseed Ctr. for Law & Justice, Inc. v. District of Columbia Dep't of Ins., Sec., & Banking,* 54 A.3d 1188, 1200 (D.C.

2012), *with, e.g., Basiliko v. District of Columbia,* 283 A.2d 816, 817–18 (D.C.1971).

4. For example, if a neighborhood organization claimed that failure to enforce compliance with the IZ regulations would harm its members' interests in a diverse neighborhood, that allegation would presumably bring the organization and its members directly within the zone of interests of the IZ regula-

*din v. Kentucky Utils.*, 390 U.S. 1, 6, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). In determining whether the zone-of-interests requirement has been met, however, courts need not restrict their consideration solely to the specific provision alleged to have been violated. Rather, courts may properly consider other provisions bearing an "integral relationship" to the provision that forms the basis for the plaintiff's legal claim. *See, e.g., Brentwood Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 661 A.2d 652, 656 n. 11 (D.C. 1995) (considering purposes of second provision to determine whether petitioners fell within zone of interests of first provision, given "integral relationship" between provisions); *National Petrochemicals & Refiners Ass'n v. EPA*, 351 U.S.App.D.C. 127, 144, 287 F.3d 1130, 1147 (2002) ("In determining whether a petitioner falls within the zone of interest to be protected by a statute, we do not look at the provision said to have been violated in complete isolation, but rather in combination with other provisions to which it bears an integral relationship.") (brackets and internal quotation marks omitted); *cf. Air Courier Conference of Am. v. American Postal Workers Union, AFL–CIO*, 498 U.S. 517, 528–31, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991) (refusing to consider purposes of one provision in determining whether plaintiff fell within zone of interests of different provision, because there was no "integral relationship" between two provisions).[5]

tions. *Cf., e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376–77, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (respondents established injury in fact under the federal Fair Housing Act by alleging that petitioners' racial steering practices harmed their interest in "important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory housing practices") (internal quotation marks omitted); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 109–11, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) ("If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that conduct.").

5. In *Bennett v. Spear*, 520 U.S. 154, 175–76, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), the Court stated:

Whether a plaintiff's interest is 'arguably ... protected ... by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question (here, species preservation), but by reference to the particular provision of law upon which the plaintiff relies. In *Data Processing* itself, for example, we did not require that the plaintiffs' suit vindicate the overall purpose of the Bank Service Corporation Act of 1962, but found it sufficient that their commercial interest was sought to be protected by the anticompetition limitation contained in § 4 of the Act—the specific provision which they alleged had been violated.

Considered in isolation, that language could arguably be read to limit the zone-of-interests inquiry to consideration solely of the specific provision alleged to have been violated. For several reasons, however, we do not interpret *Bennett* to impose such a limitation. First, the Supreme Court's earlier cases clearly endorse a broader inquiry. *See, e.g., Air Courier*, 498 U.S. at 529–30, 111 S.Ct. 913; *Clarke*, 479 U.S. at 401, 107 S.Ct. 750. We would be very reluctant to interpret *Bennett* as sub silentio overruling the Court's earlier decisions. *See, e.g., Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) (Supreme "Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio* "); *Williams v. Whitley*, 994 F.2d 226, 235 (5th Cir.1993) ("absent clear indication from the Supreme Court itself, lower courts should not lightly assume that a prior decision has been overruled *sub silentio* "). Second, the issue squarely decided in *Bennett* was that a plaintiff who falls within the zone of interests of a specific provision of an act does not lose standing simply because the overall purpose of the act might differ from the purpose of the specific provision at issue. *See Bennett*, 520 U.S. at 175–78, 117 S.Ct. 1154. That holding

WELAG alleges that the Commission's approval of the PUD violated three provisions: (1) by failing to properly consider the value of the land contributed by the District of Columbia, the Commission violated 11 DCMR § 2403.8 (2012); (2) by approving a plan that is inconsistent with the Comprehensive Plan, the Commission violated 11 DCMR § 2403.4; and (3) by permitting the PUD without insisting on compliance with IZ requirements, the Commission violated 11 DCMR §§ 2602.1, 2606.1 (2012). We conclude that these provisions are part of an integrally related zoning framework, and that the asserted interest of WELAG's members—the loss of the use and enjoyment of the existing library as a result of the approval of the PUD—falls within the zone of interests of that framework.

■ The PUD process allows the Commission to make exceptions to the zoning regulations in order to "encourage high quality developments that provide public benefits." 11 DCMR §§ 2400.1, 2400.2 (2012). In evaluating a PUD application, the Commission is directed to "judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8. Illustrative kinds of benefits include design, architecture, open space, efficient and economical use of land, safe and effective transportation, historic preservation, job creation, affordable housing, social services, and environmental benefits. 11 DCMR § 2403.9. The PUD regulations also provide that the Commission should

grant development relief only if a project "protects and advances the public health, safety, welfare, and convenience." 11 DCMR § 2400.2. The provisions governing PUDs clearly coincide with the overall purposes of the zoning regulations:

> [Z]oning regulations shall be designed to . . . promote such distribution of population and of the uses of land as would tend to create conditions favorable to health, safety, transportation, prosperity, protection of property, civic activity, and recreational, educational, and cultural opportunities, and as would tend to further economy and efficiency in the supply of public services.

D.C.Code § 6–641.02 (2001–2012). In addition, a PUD cannot be approved if it is inconsistent with the Comprehensive Plan. 11 DCMR § 2403.4.

■ Thus, the PUD process is intended to operate in conjunction with other more general zoning regulations to promote substantially the same broad purposes. *See Dupont Circle Ass'n v. District of Columbia Zoning Commission*, 426 A.2d 327, 332 (D.C.1981) ("Implicit in the concept of a PUD is the recognition that although this type of growth is an objective of the zoning regulations, it often is difficult to achieve with piecemeal, lot by lot development."); 5 Arden H. Rathkopf & Daren A. Rathkopf, *Rathkopf's The Law of Zoning and Planning*, § 88:1, at 88–9 (2012) ("[T]he intent of the planned unit development provisions is to allow more flexibility in development than is available under the general zoning ordinance provisions while continuing to allow the city to protect the interests it normally protects

---

does not necessarily imply that in all contexts the zone-of-interests inquiry must be focused exclusively on the specific provision alleged to have been violated. Third, zone-of-interests decisions after *Bennett* have continued to consider provisions that are "entwined with" or

"integrally related" to the provision alleged to have been violated. *See, e.g., Patchak*, 132 S.Ct. at 2211–12; *National Petrochemical*, 351 U.S.App.D.C. at 144, 287 F.3d at 1147; *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1179 (9th Cir.2000).

through general zoning provisions.") (quoting *Levitt Homes Inc. v. Old Farm Homeowner's Ass'n,* 111 Ill.App.3d 300, 67 Ill. Dec. 155, 444 N.E.2d 194, 202 (1982)) (brackets in original).

The IZ regulations are similarly connected to the overall zoning framework. The specific goals of the IZ regulations include increasing production of affordable housing, providing home-ownership opportunities for low-and moderate-income households, and preserving diversity and economic integration. *See* 11 DCMR § 2600.3. The IZ regulations also incorporate the concern that land be used economically. *See* 11 DCMR § 2606.1. These goals overlap with the goals of the zoning regulations to further "health and the general welfare," prosperity, civic activity, and cultural opportunities. D.C.Code § 6–641.02.

The IZ requirements interact with other aspects of the zoning regulations as well. For example, developments subject to the IZ regulations are permitted to exceed the zoning density limits by up to twenty percent. 11 DCMR § 2604.1 (2012). Further, several provisions connect the IZ regulations and the PUD regulations. First, certain PUD regulations promote affordable housing, much as the IZ regulations do. *See* 11 DCMR § 2404.2 (2012) (for applicants seeking "an increase in gross floor area devoted to office space," this section "require[s] the applicant to produce or financially assist in the production of dwellings or multiple dwellings that are affordable to low-and moderate-income people"). Second, PUD applications are evaluated in part based on their effect on "[h]ousing and affordable housing." 11 DCMR § 2403.9(f). Finally, in the order promulgating the PUD regulations, the Commission observed that relief from the IZ requirements was one type of zoning relief that could be granted during the PUD process.[6] *See* Notice of Final Rulemaking and Z.C. Order No. 04–33, 53 D.C.Reg. 7013, 7019 (Aug. 25, 2006) ("The Commission concluded that partial or full relief from the IZ requirements was a type of flexibility that could be granted through a PUD, but that the 'number and quality of commendable public benefits' proffered would clearly have to exceed those that would ordinarily suffice to gain PUD approval.").

We therefore conclude that the PUD regulations, the IZ regulations, and other more general zoning regulations at issue operate as part of an interconnected regulatory framework. We further conclude that WELAG's interest in use and enjoyment of the library is arguably one of the interests protected by that regulatory framework. As stated above, the zoning statutes and regulations are intended to "create conditions favorable to ... civic activity, and recreational, educational, and cultural opportunities" and "to further economy and efficiency in the supply of public services." D.C.Code § 6–641.02. That purpose encompasses WELAG's interest in the use and enjoyment of a public library. More specifically, interference with the use and enjoyment of a public library would arguably constitute an adverse impact that would form part of the balancing that the Commission is required to conduct in deciding whether to approve a PUD. 11 DCMR § 2403.8. Such interference would also be relevant to the determination whether a PUD would as a whole be consistent with the Comprehensive Plan. *See, e.g.,* 10–A DCMR § 1103.10 (2012) (Westlaw) (Plan provision address-

---

6. We discuss infra WELAG's claim that relief from IZ requirements may not properly be granted under the PUD regulations in the absence of a finding that "compliance ... would deny the applicant economically viable use of its land." 11 DCMR § 2606.1.

ing obsolete public facilities); 10–A DCMR §§ 1110.9, 1110.11 (2012) (Westlaw) (Plan provisions expressing policy to upgrade and modernize library system). Finally such interference would be arguably relevant to whether it would, on balance, be appropriate to grant a waiver from the IZ regulations. *See* Order No. 04–33, 53 D.C.Reg. at 7019 (to waive IZ requirements for a PUD, "the 'number and quality of commendable public benefits' proffered would clearly have to exceed those that would ordinarily suffice to gain PUD approval"). We therefore hold that WELAG's claimed injury falls within the zone of interests of the provisions upon which WELAG relies. *Cf. Downtown Cluster,* 675 A.2d at 490–91 (association of downtown churches came within zone of interests of zoning regulations where association alleged that use variance would undermine "living downtown," thus posing threat to churches' membership, programs, and property values); *Patchak,* 132 S.Ct. at 2211–12 (where United States proposed to purchase land in trust for Indian tribe, nearby resident's claimed injuries, which related to land use, met zone-of-interests requirement; although allegedly violated statute specifically addressed only land acquisition, not land use, "decisions under the statute are closely enough and often enough entwined with considerations of land use to make that difference immaterial"); *Desert Citizens Against Pollution v. Bisson,* 231 F.3d 1172, 1179 (9th Cir.2000) (recreational users of federal lands were within zone of interests of provision requiring federal government to obtain "equal value" before exchanging federal land for private land; "equal value" provision was part of larger Act with stated purpose of ensuring that public lands be managed so as to protect "scenic, . . . ecological, [and] environmental . . . values").

In addition, we see no evidence of intent to foreclose judicial review. The Commission's rules contemplate participation in proceedings before the Commission by persons whose interests in the property at issue "would likely be more significantly, distinctively, or uniquely affected in character or kind by the proposed zoning action than those of other persons in the general public," 11 DCMR § 3022.3(f)(5) (2011). Moreover, in contested cases the D.C. Administrative Procedure Act authorizes any person "adversely affected or aggrieved" by an agency order to seek judicial review. *See* D.C.Code § 2–510(a) (2001–2012); *Capitol Hill Restoration Soc. v. Zoning Comm'n,* 287 A.2d 101, 105 (D.C.1972) (holding that proceedings approving PUD applications are contested cases under D.C. APA). We therefore conclude that WELAG has both constitutional and prudential standing to assert its claims.

## III.

Before approving a PUD application, the Commission must weigh "the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8. The Commission in this case made extensive findings as to the public benefits and amenities that the PUD would provide. It determined that the PUD would offer specific public benefits in all of the following areas: design, architecture, and open space; efficient and economical land use; transportation and traffic management; housing; and the environment. In addition, the Commission found that the new library would have "significantly improved facilities," that the new fire station would benefit safety, and that the PUD offers

"exemplary, world-class architecture" and is "a benchmark in excellence." [7]

The Commission also made numerous findings about potential negative effects of the PUD. For example, the Commission found that the PUD adequately addresses traffic concerns. To mitigate negative traffic effects, the PUD would widen and repave the existing alley, offer various parking options, and provide public transit benefits and bike- and car-share program memberships to the first occupant of each unit. The Commission noted that, in response to concerns about the scale and density of the project, EastBanc decreased the size of the penthouse, increased the penthouse setback, and increased the setback distance between the PUD and a neighboring condominium. The Commission stated that the effects of the PUD on light, air, views, and density in the neighborhood would be acceptable, given the mixed-use development already present in the area and the high-quality benefits the PUD would provide.

■■■■■ The Commission declined, however, to consider the value of the land rights to be transferred to EastBanc as an "adverse effect" under 11 DCMR § 2403.8. The Commission noted that the Mayor and the D.C. Council had "negotiated and entered into a land distribution agreement under which the developer agreed to construct these two important facilities at no direct cost," and the Commission declined to "second guess the calculations that led the District ... to conclude this was a good deal." This court will "defer to an agency's interpretation of its own regulations unless that interpretation is plainly wrong or inconsistent with the regulations or with the statute under which the [agen-cy] acts." *Hotel Tabard Inn v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 747 A.2d 1168, 1178 (D.C.2000) (internal quotation marks omitted); *1330 Conn. Ave., Inc. v. District of Columbia Zoning Comm'n,* 669 A.2d 708, 714–15 (D.C.1995) ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.") (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). For three principal reasons, we uphold as reasonable the Commission's conclusion that § 2403.8 did not require consideration of the financial underpinnings of the land transfer.

■■■■■ First, assessment of the financial underpinnings of the underlying land transfer does not fall within the core of the Commission's expertise in land-use matters. Municipal financing and the appraisal of real-estate assets are not traditional subjects of zoning. *See, e.g., Ehrlich v. Culver City,* 12 Cal.4th 854, 50 Cal.Rptr.2d 242, 911 P.2d 429, 447 (1996) ("The general purpose of zoning and planning is to regulate the use of land to promote the public welfare...."); *Mayor of Annapolis v. Anne Arundel Cnty.,* 271 Md. 265, 316 A.2d 807, 821 (1974) ("traditional zoning is primarily directed at the use of land, as well as the density and the location of buildings on the land"). WELAG has not pointed us to, and we have not found, authority mandating that a zoning agency consider the financial implications of an underlying transfer of public lands.

Second, the decision whether to transfer public lands is assigned to the Mayor and the Council. D.C.Code § 10–801(a)(1) (2001–2012) ("Except for real property disposed of pursuant to § 6–1005(c), the May-

---

7. WELAG argued before the Commission that it was error for the Commission to consider the fire station in weighing the proposal's benefits and detriments, because the plans for the fire station were not included in the PUD application. Because WELAG does not renew that contention in this court, we need not address that issue.

or is authorized and empowered, in his discretion, for the best interests of the District of Columbia ..., and with the approval of the Council by resolution, to sell, convey, lease ... or otherwise dispose of real property, in whole or in part, now or hereafter owned in fee simple by the District...."). Although this consideration is not in itself dispositive, *see Levy v. District of Columbia Bd. of Zoning Adjustment*, 570 A.2d 739, 750 (D.C.1990), it is relevant to whether the Commission reasonably declined in this case to consider the underlying financial aspects of a land-transfer decision already made by the Mayor and the Council. Other courts have held that agencies in some circumstances appropriately can, or even must, defer to the prior determination of another agency with overlapping authority. *See, e.g., Delta Air Lines, Inc. v. Civil Aeronautics Bd.*, 177 U.S.App.D.C. 100, 113, 543 F.2d 247, 260 (1976) (finding that Civil Aeronautics Board may permissibly defer to Federal Aviation Administration findings on air safety); *New Brunswick Cellular Tel. Co. v. Township of New Brunswick Bd. of Zoning Adjustment*, 300 N.J.Super. 456, 693 A.2d 180, 188–89 (Law Div.1997) (zoning board was precluded by statute from considering health effects of radiation emitted by cell towers, where different state agency was charged with regulating radiation emissions); *cf. Foggy Bottom Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 791 A.2d 64, 71–72 (D.C.2002) (noting that, under D.C. Environmental Policy Act, where multiple agencies are involved in project, only lead agency is responsible for preparation of environmental impact statement).

Third, WELAG does not allege that the Commission has been inconsistent in its interpretation of § 2403.8. *Cf. Tenants of 738 Longfellow St. v. District of Columbia Rental Hous. Comm'n*, 575 A.2d 1205, 1213 (D.C.1990) (greater deference owed to agency construction of statute that is consistent and long-standing). Our past cases reveal that the Commission has considered a number of factors as "adverse effects" in the PUD process, but in none of those cases did the Commission address a consideration as far afield from traditional zoning concerns as the question of the financial underpinnings of an underlying public-land transfer. *See, e.g., Cathedral Park Condo. Comm. v. District of Columbia Zoning Comm'n*, 743 A.2d 1231, 1247 (D.C.2000) (considering "light or visual impacts" and potential negative impacts "from an architectural or urban planning perspective"); *Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 140 (D.C.1991) (height as potential adverse effect); *Wisconsin–Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.3d 382, 387–89 (D.C.2011) (traffic, height, and density as potential adverse effects); *cf. Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n*, 639 A.2d 578, 589–90 (D.C.1994) (upholding Commission's decision not to consider impacts of relocation of church feeding program for homeless in approving PUD, where connection between PUD approval and church relocation was "tenuous").

We view this case as quite different from *Levy*, the case upon which WELAG principally relies. In *Levy*, the Board of Zoning Adjustment refused to examine the effects of street closings and pedestrian bridges that were included as part of a proposed campus plan. 570 A.2d at 750. The street closings and pedestrian bridges in *Levy* would have had potential implications for traffic, parking, and pedestrian safety, *id.* at 744, which are traditional zoning considerations. *See* D.C.Code § 6–641.02 ("zoning regulations shall be designed to lessen congestion in the street, ... [and] to provide adequate light and

air"); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 394–95, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (acknowledging effects on air, light, noise, traffic, safety, and open space as important zoning considerations). In addition, the Commission's decision in *Levy* occurred before any other agency had made a decision, so there was no prior decision to which to defer. *Levy*, 570 A.2d at 745. Finally, the Commission in this case did not defer entirely to the judgment of the Mayor and Council on the impact of the land transfer. *See* Order 20 (finding that PUD would promote Comprehensive Plan's policy of retaining government-owned property for community uses when feasible). Rather, the Commission deferred to the judgment of the Mayor and the Council only with respect to the underlying financial calculations and the financial terms of the transaction. *See* Order 33 (declining to "second guess the calculations that led the District ... to conclude this was a good deal").

To be clear about our holding, we do not suggest that the Commission is necessarily precluded from regulating or considering non-traditional subjects of zoning; for example, the Council has explicitly directed the Commission to consider other non-traditional zoning subjects, such as historic preservation, D.C.Code § 1–306.01(a)(2) (2001–2012), and affordable housing, D.C.Code § 6–1041.01 et seq. (2001–2012). *See Anne Arundel Cnty.*, 316 A.2d at 821 (historic preservation not traditional zoning subject); *Board of Supervisors v. DeGroff Enters.*, 214 Va. 235, 198 S.E.2d 600, 602 (1973) (inclusion of particular socioeconomic groups not traditional topic of zoning ordinances); 1 Rathkopf & Rathkopf, *supra*, § 1:14, at 1–44 (describing trend in modern zoning codes of using inclusionary zoning to increase supply of affordable housing). Nor do we decide whether the Commission would have been permitted, had it chosen to do so, to look behind the determinations made by the Mayor and the Council or to otherwise consider the implications of the underlying land transfer. Rather, we merely hold that, for the reasons stated, the Commission acted reasonably in interpreting its own regulation to permit it to decline to look behind that land transfer.

WELAG also suggests that the Commission should have considered the land transfer as a development incentive provided to EastBanc. WELAG did not raise this argument until its reply brief, and thus it is not properly before us. *See Levelle, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 924 A.2d 1030, 1038 (D.C.2007). In any event, essentially for the reasons we have previously stated, the Commission could reasonably conclude that the underlying land transfer was not a "development incentive" within the meaning of its regulations. 11 DCMR § 2403.8.

■ Finally, WELAG asserted before the Commission that the public benefits provided by the PUD are required under the terms of EastBanc's contract with the District of Columbia, and have already been "paid for" by the District of Columbia, through the land transfer. WELAG thus reasoned that it was "double-counting" for the Commission to consider the library and fire station as public benefits under the PUD regulations. WELAG does not renew this argument in its briefs on appeal, and so we need not address it. *See Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (court will not address legal contentions that party does not support by argument). It is far from clear, however, that WELAG's argument would have merit. We have already concluded that the Commission was permitted to decline to consider the value of the land as an adverse effect, and the question of whether the District of Columbia "paid

twice" for the construction of the library and fire station is simply a variant of the same general idea.

For the reasons stated above, we defer to the Commission's decision not to consider the financial implications of the underlying land transaction.[8]

## IV.

### A.

The Commission determined that waiver of IZ requirements can be granted through the PUD process, if "the number and quality of commendable public benefits proffered ... clearly ... exceed those that would ordinarily suffice to gain PUD approval." Order 28–29 (quoting Order 04–33, 53 D.C.Reg. at 7019). WELAG contends that such relief is permissible only when compliance with IZ requirements "would deny the applicant economically viable use of its land." 11 DCMR § 2606.1. We conclude that the Commission reasonably interpreted the applicable statutory and regulatory provisions.

■ The PUD process was designed to provide relief from zoning requirements. 11 DCMR § 2400.2. Successful applicants receive zoning relief in exchange for superior public benefits. 11 DCMR §§ 2403.6, 2403.8, 2403.10, 2403.11(b). There is no indication in the PUD regulations that relief can be granted only with respect to certain zoning requirements, nor do the IZ

regulations indicate that they should be treated differently in the PUD process from any other zoning requirement. *See* 11 DCMR § 2400 et seq.; 11 DCMR § 2600 et seq.; D.C.Code § 6–1041.1 et seq.; *cf. Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n,* 979 A.2d 1160, 1169 (D.C.2009) ("We have found nothing in the Zoning Regulations that prohibits the use of PUDs in conjunction with campus plans. By contrast, there currently are eleven provisions of the Zoning Regulations that impose express limitations on the degree of flexibility that can be permitted through the use of PUDs in certain districts, demonstrating that the Commission knows how to restrict PUDs when it chooses to do so.") (footnote omitted). The Commission reasonably interpreted these provisions to mean that a PUD applicant may receive relief from IZ requirements if the Commission determines that such relief is warranted, just as an applicant may receive relief from other zoning requirements.

The Commission has expressed this interpretation in the past, both at public hearings on the IZ regulations and in its order promulgating those regulations. *See* Notice of Final Rulemaking and Z.C. Order No. 04–33, 53 D.C.Reg. at 7019; 5/18/2006 Zoning Commission Hearing Tr. 36. The Commission's consistent interpretation is reasonable and is entitled to deference. *See generally Longfellow St.,* 575 A.2d at 1213.

---

8. More broadly, WELAG claims that the Commission did not provide adequate analysis to support its findings that the PUD's benefits outweighed the PUD's adverse effects, and that the Commission did not establish "a rational connection between the facts found and the choice made." We review such findings deferentially. *Watergate E. Comm. Against Hotel Conversion to Co-op Apartments v. District of Columbia Zoning Comm'n,* 953 A.2d 1036, 1043 (D.C.2008) ("If there is substantial evidence to support the [Commission's] find-

ing, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the [Commission].") (quotation marks omitted; brackets in original). As described above, the Commission's order cites numerous reasons for the conclusion that the PUD's public benefits warrant the requested zoning relief and that the PUD's negative effects would be acceptable when compared with the benefits. We see no basis for overturning that conclusion.

### B.

■ The Commission found that the IZ requirements should be waived, because otherwise the PUD would not generate enough revenue to support the project. WELAG argues that this finding was unsupported by substantial evidence and that the Commission failed to explain how the record supports this finding. We review the Commission's factual findings to determine if they are supported by substantial evidence in the record. *Watergate*, 953 A.2d at 1042–43. We may not substitute our judgment for that of the Commission. *Id.* We conclude that substantial evidence in the record supports the Commission's determination and that the Commission's explanation was adequate.

The Commission found that "the enhanced level of service that will result from the construction of the new Library and Fire Station so clearly will enhance the neighborhood that they set a benchmark in excellence for any future requests for IZ waivers through the PUD process." It further found that, without waiver of the IZ requirements, the project would not generate enough revenue for EastBanc to build the new library and the fire station, and concluded that "under these unique circumstances" waiving the IZ requirements was warranted.

■ WELAG does not challenge the Commission's findings that the PUD will provide an enhanced level of service and "set a benchmark in excellence," and so we do not review those findings.[9] *See Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 43 n. 10 (D.C.1979) ("[W]e deal only with issues of fact which are still contested; we thus assume the validity of findings and conclusions unquestioned by the petitioner."). We note, however, that EastBanc presented evidence in support of the Commission's determination that the new library would offer an enhanced level of service, including a statement from the Coalition for Smarter Growth that "[b]oth the café attached to the library and accessible community meeting spaces are features that communities throughout the city have requested for new libraries"; the DMPED Program Manager's description of the project as replacing a deteriorating, outdated library with a "brand new world class library"; testimony of the District of Columbia Chief Librarian that public library staff had participated in the planning process from the beginning, were "very pleased that this project has been developed," and "look forward to being in that new library"; and a statement from the West End Library Friends that the library proposal incorporates stakeholder recommendations regarding the community's needs for functionality, meeting rooms, and educational enrichment and service.

■ WELAG objects that the Commission made "no attempt to demonstrate that the cited materials support its finding" that the project would not generate adequate revenue without relief from the IZ requirements.[10] We find, however, that

---

9. WELAG forfeited such a challenge by waiting until oral argument to raise it for the first time. *See Gladden v. District of Columbia Bd. of Zoning Adjustment*, 659 A.2d 249, 256 n. 5 (D.C.1995) ("because the District *first* presented this new contention during oral argument and this argument itself raises issues of possible waiver and failure to preserve it for

appeal we conclude the District is bound by its brief").

10. WELAG also appears to suggest that the PUD violates D.C. Council Resolution 18–552, 57 D.C.Reg. 7621, 7621 (Aug. 20, 2010), which indicated that the project would include affordable housing. We note, however, that the later-enacted West End Parcels De-

the cited materials provide substantial support for the Commission's finding. The Commission based its conclusion on the expert testimony and submissions of East-Banc and the D.C. government. The DMPED Project Manager testified that "the only way to generate enough funds for the public benefits is to have the Developer pay market rate for .... all of the approved density, so we are asking for the waiver." In addition, EastBanc provided a budget based on its estimated construction costs and the price per square foot of density that EastBanc would be paying. Neither WELAG nor any of the other opponents of the PUD application presented reports or testimony specifically challenging the financial analysis underlying the conclusion that IZ waiver would be necessary in order for the land value to finance construction of the public facilities. In the absence of such contrary evidence and there being no facial deficiency in the evidence that would have required the Commission to discuss the financial justification for IZ waiver in more detail, we conclude that the unchallenged submissions and testimony constituted substantial evidence that a "reasonable mind might accept as adequate to support a conclusion." *Ferreira v. District of Columbia Dep't of Emp't Servs.*, 667 A.2d 310, 312 (D.C.1995) (internal quotation marks omitted); *cf. D.C. Appleseed*, 54 A.3d at 1218–

19 (reversing and remanding agency determination for further consideration where agency order did not explain choice made from among conflicting financial analyses and did not take into account statutory requirement of community reinvestment to maximum feasible extent).[11]

WELAG asserts that the Commission's finding is flawed, because the Commission granted EastBanc the flexibility to build between 153 and 189 residential units. WELAG appears to reason that, if the proposed PUD would generate adequate revenue with only 153 full-priced units, then the PUD necessarily would also generate adequate revenue with 14 IZ units and 175 full-priced units. This argument appears to rest on the assumption that each full-priced unit would generate the same amount of revenue, which in turn seems to rest on the further assumption that the units would be the same size no matter how many of them were built. WELAG's assumptions seem unwarranted, however, given that the Commission granted flexibility in the number of units, but not flexibility in the total square footage. *See* Order 36 (approving EastBanc's application to build "a multi-family residential building ... with a gross floor area of approximately 289,004 square feet and 153 to 189 dwelling units"). It thus appears

velopment Omnibus Act, § 2(8)(D), clarified that the inclusion of affordable-housing units in connection with the PUD would be subject to the availability of public funding.

11. Unlike in the *D.C. Appleseed* case, here we can have confidence that the Commission made its waiver determination with full awareness of the importance of the IZ requirements in the regulatory scheme. During the Commission proceedings, several of the commissioners expressed their understanding of and support for the IZ requirements and requested additional information from East-Banc about the financial considerations underlying the waiver request. Commissioners expressed the view that this project presented an "extraordinary" circumstance unlikely to arise with frequency in future PUD applications, and that the project would not be "precedent setting," because PUD applications are considered on a case-by-case basis. We have no occasion in this case to consider appellant's argument, made before the Commission but not raised in this court, that the Commission should as a matter of policy adopt guidelines for use in the PUD context similar to the ones used by the Board of Zoning Adjustment in its financial evaluation of requests for IZ waivers.

that increasing the number of units would decrease the average unit size, which would presumably also decrease revenue per unit. We therefore perceive no basis upon which to overturn the Commission's decision to waive the IZ requirements.

## V.

 The Commission found that the PUD would be consistent with many of the policies contained in the District of Columbia Comprehensive Plan, 10–A DCMR § 100 et seq. (2012) (Westlaw), and determined accordingly that the PUD would not be inconsistent with the Plan as a whole. See 11 DCMR § 2403.4 ("The Commission shall find that the proposed PUD would not be inconsistent with the Comprehensive Plan . . . ."). WELAG argues, however, that the PUD would be inconsistent with the policy that "land resources should generally be preserved in District ownership if a facility is found to be obsolete. . . ." 10–A DCMR § 1103.9. WELAG's objection appears to be rooted, in part, in an incorrect understanding of the transaction at issue. WELAG asserts that, "[n]ot only does the proposed PUD contemplate the transfer of two separate parcels of public property housing two valuable public facilities—the Library and the Fire Station—but also, the District is neither leasing nor even selling the Property, but rather is giving it away to a private developer, free of charge, in order to 'leverage' its value."

In fact, as previously explained, the District would retain ownership of the air rights occupied by the new fire station and the new library. Accordingly, the Commission found that the PUD would promote the Plan's policy to "[r]etain District-owned property for community facility uses. Wherever feasible, the District should use short- or long-term leases for lands not currently needed so as to preserve the District's long-term supply of land for public use." 10–A DCMR § 1103.9.

Even if it would arguably be "more consistent" with § 1103.9 to lease the land to EastBanc instead of transferring the land and retaining the air rights, that would not mean the PUD would be inconsistent with the Comprehensive Plan. Our cases recognize that the Commission may balance competing priorities in order to evaluate whether a project would be inconsistent with the Plan as a whole. See Watergate, 953 A.2d at 1051 (upholding Commission determination that PUD would not be inconsistent with Comprehensive Plan where Commission concluded that advancing Plan's housing goals outweighed adverse impact upon Plan's hotel-improvement goals and that over-emphasis of hotel provisions would "not yield a complete picture of the goals, objectives, and policies of the Plan"); Citizens' Coal. Against Proposed Brookings Office Bldg. v. District of Columbia Zoning Comm'n, 516 A.2d 506, 510 n. 3 (D.C.1986) (upholding Commission determination that PUD would not be inconsistent with Comprehensive Plan, even though project would lead to "slight increase of office use over residential use" in area that Plan designated for predominantly residential uses). Here, many of the policies that would be furthered by the PUD relate directly to the topic of replacing obsolete public facilities. For example, the Commission determined that the PUD would promote efforts to "[c]onstruct, rehabilitate, and maintain" facilities for public services; to reuse or dispose of public facilities "that are functionally obsolete" or "cannot be rehabilitated cost-effectively"; to "[l]ocate new public facilities to support economic development and neighborhood revitalization efforts"; to "overhaul, upgrade, or re-build" branch libraries; and to "[e]xplore public-private partnerships to

fund the construction of new libraries, including ... within mixed use projects on existing library sites." *See* 10–A DCMR §§ 1103.6, 1103.10, 1103.13, 1110.11, 1111.3 (2012) (Westlaw).

The Commission's discussion of the numerous policies in the Comprehensive Plan that are consistent with the PUD is extensive and detailed, and the record amply supports the Commission's determination that the PUD would not be inconsistent with the Plan as a whole. *See Wisconsin–Newark,* 33 A.3d at 395 (Commission adequately explained how PUD was "not inconsistent with the Comprehensive Plan *as a whole*" where order was "replete with references as to how the rezoning ... was not inconsistent with the Comprehensive Plan") (internal quotation marks omitted).

WELAG also appears to contend that there was no evidentiary basis for the Commission's finding that the PUD would further the Plan policies addressing obsolete public facilities and adequate fire stations. *See* 10–A DCMR § 1103.10, 1114.8 (2012) (Westlaw). In its order denying WELAG's motion for reconsideration, the Commission did, however, cite to evidentiary bases for those findings, including a DMPED letter declaring that the fire station needs to be renovated or replaced and the D.C. Fire and Emergency Medical Services Department Battalion Chief's testimony that the existing station is fifty years old and that the community would be better served by a new fire station. To the extent that WELAG suggests that a fire station could be outmoded only if the station was unable to respond to calls within the required time limits, WELAG provides no support for that counterintuitive proposition.

■ Finally, WELAG asserts in passing that the Commission should be directed to make findings regarding whether the PUD would be consistent with the Plan provisions that pertain to affordable housing and workforce housing. *See* 10–A DCMR §§ 504.11, 504.12 (2012) (Westlaw). WELAG does not suggest that the PUD would be inconsistent with these provisions or provide any other explanation for its assertion. WELAG therefore has not properly presented that argument to this court. *See* D.C.App. R. 28(a)(8)(A); *Bardoff,* 628 A.2d at 90 n. 8. In any event, for the reasons already stated, the Commission reasonably concluded that the PUD would not be inconsistent with the Comprehensive Plan as a whole.

The order of the Zoning Commission is therefore

*Affirmed.*