*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-AA-262

LESLIE RANDOLPH, *et al.*, PETITIONERS,

V.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

HOFFMAN-STRUEVER WATERFRONT, LLC, INTERVENOR.

Petition for Review of an Order
of the District of Columbia Zoning Commission
(ZC-03A-11)

(Argued December 3, 2013     Decided January 23, 2014)

*Andrea C. Ferster* for petitioners.

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Donna M. Murasky*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, filed a statement in lieu of brief for respondent District of Columbia Zoning Commission.

*Philip T. Evans*, with whom *Norman M. Glasgow, Jr.*, and *Mary Carolyn Brown* were on the brief, for intervenor.

Before FISHER and EASTERLY, *Associate Judges*, and STEADMAN, *Senior Judge*.

FISHER, *Associate Judge*:  On February 13, 2013, the Zoning Commission for the District of Columbia granted second-stage approval of a planned unit development (PUD) for the property known as parcel 11 at the Southwest Waterfront.  Intervenor Hoffman-Struever plans to redevelop a twenty-two acre section of the waterfront and, as part of this project, intends to build a large building on parcel 11.  Constructed primarily on land owned by the Vestry of St. Augustine's Church, the proposed building will have two distinct sections.  The northern section, built on parcel 11A, will contain a new church building, while parcel 11B will contain a 109-unit residential development.  Petitioners reside in the townhomes directly across Sixth Street from parcel 11.  They argue that the structure will exceed the maximum lot occupancy allowed and that the Zoning Commission ignored the historic designation of the housing complex in which they live.  We disagree and affirm the Zoning Commission's order.

## I.     The Zoning Commission's Role

"A P.U.D. applicant generally requests that a site be rezoned to allow more intensive development, in exchange for which the applicant offers to provide 'amenities' or 'public benefits' which would not be provided if the site were developed under matter-of-right zoning."  *Blagden Alley Ass'n v. District of*

*Columbia Zoning Comm'n*, 590 A.2d 139, 140 n.2 (D.C. 1991) (citing 11 DCMR § 2400.2). When evaluating a PUD application, the Zoning Commission is required to "judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8 (2013).

A PUD application may be submitted as part of a one-stage or two-stage process. 11 DCMR § 2402.1 (2013). In a two-stage process, "[t]he Commission's first-stage approval shall set forth the appropriate zoning classification to apply to the project, and shall state in detail the elements, guidelines, and conditions that shall be followed by the applicant in the second-stage application." 11 DCMR § 2407.9 (2013). The second-stage application will be approved "[i]f the Commission finds the application to be in accordance with the intent and purpose of the Zoning Regulations, the PUD process, and the first-stage approval." 11 DCMR § 2408.6 (2013).

This court "must affirm the [Zoning] Commission's decision so long as (1) it has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) its conclusions of law

follow rationally from those findings." *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1167 (D.C. 2013) (citations omitted).

## II.    Maximum Lot Occupancy

During the first-stage PUD application, Hoffman-Struever requested relief from the 60% maximum lot occupancy provided for in an R-5-B district.[1] The developer anticipated improving 73% of the lot, explaining that this was necessary to reduce the height of the church and the residential building and to allow above-grade, screened parking. Petitioners countered that their quality of life would be severely compromised if this degree of flexibility were approved because it would decrease their light and air as well as their views of the water. The Commission approved the stage-one PUD application, noting that the requested incentives "accommodate the competing interests of moderate-density development against the need to provide an appropriate transition to existing stable neighborhoods." Petitioners did not challenge this order.

---

[1] "**Percentage of lot occupancy**— a figure that expresses that portion of a lot lying within lot lines and building lines that is occupied or that may be occupied under the provisions of this title as building area . . . ." 11 DCMR § 199.1 (2013).

In its second-stage PUD application, Hoffman-Struever increased its request, asking for a maximum lot occupancy of 86% for parcel 11. Although the footprint of the proposed building had actually decreased in size, this request was necessitated by a decrease in the overall size of the lot.[2] Petitioners claimed that this significant increase in lot occupancy was inconsistent with the first-stage approval and again argued that their quality of life would be severely compromised.

The Commission found that a maximum lot occupancy of 86% was "[c]onsistent with [its] finding in the Stage 1 application," and "suitable under the circumstances." "[T]he increased lot coverage on Parcel 11 is designed principally to accommodate parking on the ground floor rather than increased living spaces." Although the lot occupancy previously approved could be achieved by eliminating the roof from the building's covered parking or by extending the boundaries of the

---

[2] As proposed, Parcel 11 will become "one lot of record and consist of current Lots 83 and 814 in Square 473, as well as portions of Water Street and M Place, S.W." Lots 83 and 814 are owned by the Vestry of St. Augustine's Church, while the District of Columbia owns the surrounding roadways. Initial plans proposed including large portions of the surrounding roadways in Parcel 11, but the current proposal has reduced the amount of land taken from the roadways, in order to allow for greater traffic flow and more parking on Water Street and M Place, S.W.

lot, the Commission explained that these actions would be "an unnecessary exercise in zoning technicalities." Not only would uncovering the parking provide no real benefit to petitioners, it would be a detriment to residents of the PUD who would lose a central courtyard. Moreover, the Commission noted that the minimal impact of this requested incentive was offset by several benefits provided by the PUD, "including the provision of exceptional open spaces and public parks, most notably Waterfront Park[,] . . . [a] beautifully designed park . . . located immediately south of the residential building and diagonally across from the Sixth Street Neighbors['] residences."

The Commission found "the Stage 2 PUD application to be in accordance with the intent and purpose of the Zoning Regulations, the PUD process, and the first-stage approval," and ordered that "[t]he Parcel 11 Building may be constructed to a maximum lot occupancy of 86%." Petitioners moved for reconsideration, but they "did not offer any new evidence or allegation of legal error but simply re-stated their disagreement with the Commission's decision." Having previously "fully vetted the lot occupancy controversy," the Commission found "no reason to disturb its finding on this issue." Petitioners now challenge this order.

An R-5 zoning designation allows "flexibility of design" and encourages "all types of urban residential development if they conform to the height, density, and area requirements." 11 DCMR § 350.1 (2013). R-5-B districts are "generally consistent with the Medium Density designation." 10-A DCMR § 225.5 (2013). "This designation is used to define neighborhoods or areas where mid-rise (4-7 stories) apartment buildings are the predominant use." *Id*. Under traditional zoning, no structure in an R-5-B district may occupy more than 60% of its lot. 11 DCMR § 403.2 (2013). When considering a PUD, "[h]owever, the Commission shall have the option to approve a lot occupancy greater or lesser than the normal requirement, depending upon the exact circumstances of the particular project." 11 DCMR § 2405.4 (2013).

Here, petitioners argue that "the Commission's zoning flexibility should be presumptively capped at the 75% maximum lot occupancy permitted for the highest density residential zones." There is no support for this presumptive limitation on the Commission's authority, and such a cap is inconsistent with some existing zoning regulations. For example, inclusionary zoning regulations allow "bonus density" for projects that provide affordable housing, including permitting projects in the highest density residential zone to occupy 90% of their lot. 11 DCMR § 2604.2 (2013). Another regulation permits a lot occupancy of 100%

for a specific structure in a designated R-5 district. 11 DCMR § 1804.6 (2013). Because the regulations envision residential zones with buildings occupying 90% or more of their lot, we decline to impose the presumptive cap espoused by petitioners.

Petitioners also contend that the decision to allow increased lot occupancy was not supported by substantial evidence. In particular, they claim that the Commission failed to make findings supporting a higher percentage of lot occupancy and ignored the negative impact this density would have on their properties. Petitioners are mistaken. Although the Commission commented that "lot occupancy limitations are in place to protect the light and air of the individual lot, not necessarily an adjoining lot[,]" it also found that "the higher lot occupancy has no effect on [petitioners]." This was true in part because the petitioners are "separated [from parcel 11] by a 38-foot cartway, plus sidewalks and planting strips with street trees on either side, which allow for additional light and air at their own properties."

Moreover, the Commission found that "[i]f the Applicant were to reduce the lot occupancy to 60%, the building's interior courtyard area might increase or the lot area might simply get larger. Neither would change the height nor street

elevations of the residential building, nor otherwise affect how [petitioners] experience the building."[3] The Commission therefore concluded that the increased lot occupancy "is warranted in this instance and can be granted without negatively affecting the light and air of residents of the building or adjoining property owners." The impact of this incentive was "counterbalanced by open spaces spread throughout the project" and the Commission found that "the project benefits and amenities are reasonable trade-offs for the requested development flexibility." Because the Commission's conclusion is supported by substantial evidence, and is not contrary to law, we will not disturb it.[4]

---

[3] Additionally, an exhibit from the record compares "by-right" development under the previous R-3 requirements with the residential building proposed as part of the PUD. It demonstrates that row houses constructed along Sixth Street without any zoning flexibility would have a substantially similar impact on petitioners' views and their light and air.

[4] Petitioners claim for the first time in their reply brief, and without having raised the issue below, that there was a "major flaw in the calculation of lot occupancy in the Stage 2 PUD" because "additional land . . . from . . . the north 30 feet of M Place S.W." was erroneously included in measuring the size of the lot. "Our consideration of a claim raised for the first time on appeal deprives the administrative agency of its right to consider the matter, make a ruling, and state the reasons for its action . . . ." *Hill v. District of Columbia Dep't of Emp't Servs.*, 717 A.2d 909, 912 (D.C. 1998). Moreover, "[i]t is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief." *Gathy v. United States*, 754 A.2d 913, 916 (D.C. 2000) (quoting *Stockard v. Moss*, 706 A.2d 561, 566 (D.C. 1997)). Because petitioners failed to raise this issue during the contested case below, in their motion for reconsideration, or in their initial brief, we will not consider it.

## III. Historic Designation

During the stage-one PUD approval process, petitioners objected to the height, massing, and lot occupancy of the residential building, arguing that it would cause "unique and severe adverse effects, particularly in light of the unique design of Tiber Island, which was intended to maximize light and air and water views." The Commission found "that the viewsheds and property values of the Tiber Island homeowners are not protected by any restrictive covenants or by the Zoning Regulations." Nevertheless, "the PUD has been designed in such a way as to minimize the effects of the development on the adjacent residential community through appropriate setbacks and height limits." The Commission also found that the developer had "struck the proper balance in accommodating the needs of development with the Tiber Island community." Petitioners did not seek review of these findings.

On May 24, 2012, between the stage-one PUD approval and the hearings on the stage-two PUD application, the Tiber Island complex was awarded historic landmark status by the District of Columbia Historic Preservation Review Board. The HPRB commented that "[t]he planning, landscaping, and architecture of Tiber Island speak to an idealism for urban living through its mixture of high and low

rise units, [and] integration of open landscapes and private gardens . . . ." Petitioners touted this newly awarded historic designation while opposing the stage-two PUD application. In its order, the Commission acknowledged the petitioners' argument that they would suffer adverse effects due to "the unique design of Tiber Island, an historic landmark, which was intended to maximize light and air and water views." However, the Commission found "that the majority of the issues raised by the Sixth Street Homeowners were already decided . . . in the Stage 1 PUD." The Commission concluded that it "need not revisit issues that have already been decided."

Petitioners challenged this ruling in a motion for reconsideration which the Commission denied, stating that "[b]ecause the Tiber Island Complex is not part of the PUD, and the PUD does not propose any changes to the designated landmark, the landmark status of Tiber Island was immaterial to [its] decision in the Stage 2 PUD." Nevertheless, referring to language we have quoted in the preceding paragraph, the Commission pointed out that, "contrary to the Homeowners' assertion, the Commission *did* acknowledge the historic status of Tiber Island in the [stage-two] order . . . ."

According to petitioners, "the PUD regulations make clear that the Commission must consider adverse impacts on historic properties, without limitation, including adverse effects on abutting historic properties." To be sure, PUD regulations require the Commission to examine "any potential adverse effects [of the PUD] according to the specific circumstances of the case." 11 DCMR § 2403.8 (2013); *see also* 11 DCMR § 2403.3 (2013) (for PUD to be approved, "impact of the project on the surrounding area" may not be unacceptable, but shall be either "favorable, capable of being mitigated, or acceptable given the quality of public benefits in the project"). But these regulations apply to PUDs in general, and the Commission had already considered them. None of the law governing historic preservation that petitioners cite gives them additional leverage in combatting the PUD application at issue here.[5]

---

[5] On the contrary, statutes and regulations governing historic preservation appear to support the Commission's interpretation, to which we defer. *See* D.C. Code §§ 6-1105 (a), -1107 (a) (2012 Repl.) (building permits for construction or alteration need only be reviewed under the historic preservation regulations when the construction or alteration is "in an historic district or on the site of an historic landmark"); 10-C DCMR § 303 (2013) ("Permits are required for work affecting historic landmarks and historic districts . . . ."); 10-C DCMR § 9901 (2013) (an historic landmark is "[a] building, structure, object or feature, and its site"); 10-A DCMR § 1007.4 (2013) (historic preservation reviews are required for construction, subdivision, alteration, or demolition of "a historic property").

For similar reasons, we reject petitioners' claim that the Commission was required to address the Historic Preservation Elements of the Comprehensive Plan in its stage-two PUD order. *See* 10-A DCMR §§ 1000-1018. Citing many neighborhood preservation elements of the Comprehensive Plan,[6] petitioners assert that "[t]he adverse impacts on Tiber Island [are] all the more detrimental in light of Tiber Island's designation as a historic landmark." But the Commission had already addressed the character of the neighborhood and it devoted approximately ten pages of its stage-one order to discussing the Comprehensive Plan. Although the complex in which petitioners live is now a protected property, the Commission noted that their property "is not part of the PUD, and the PUD does not propose any changes to the designated landmark . . . ." Accordingly, none of the Historic Preservation Elements of the Comprehensive Plan applied any differently in light of the historic designation.

---

[6] *See* 10-A DCMR § 308.1 (2013) (land use should "protect[] the defining characteristics of each community"); 10-A DCMR § 309.21 (2013) (emphasizing the need for appropriate match between zoning and existing land use to protect the "predominant architectural character of the neighborhood"); 10-A DCMR § 309.3 (2013) (explaining that in "stable" neighborhoods, land use policies "have focused on retaining neighborhood character"); 10-A DCMR § 223.1[2] (2013) (development in a Land Use Change Area should be "compatible with and . . . not negatively impact nearby neighborhoods").

As discussed above, the Commission was sensitive to the character and unique design of Tiber Island throughout the PUD application process. In its stage-one PUD order, the Commission found that the developer "struck the proper balance in accommodating the needs of development with the Tiber Island community. . . . [It] has successfully accommodated the competing interests of moderate density development against the need to provide an appropriate transition to existing stable neighborhoods."

Furthermore, during the stage-two PUD review, "the Commission requested [the developer] . . . try to provide a more sympathetic design to 6th Street to address continuing comments from the adjacent neighbors." Intervenor "agreed to match the brick color from the Tiber Island condo/coop more closely and to eliminate the darker color brick from the color palette in response to . . . specific concerns." Petitioners had requested "setbacks" and complained that "the proposed apartment building's mass and density will detract from Tiber Island by making the street appear canyon like, tight and narrow." As a result, the developer shifted "the entire building five feet westward" allowing the entries on Sixth Street to appear "more gracious," and also "accommodat[ing] two-way traffic, while maintaining on-street parking and a generous sidewalk and planting zone, in response to community comments." The Commission found that "[t]his modest

change" would "further enhance[] the residential quality of this block and is responsive to the concerns raised by the Sixth Street Neighbors."

In sum, we are satisfied that the Commission adequately addressed the impact of the PUD on the Tiber Island community. Under the circumstances presented here, the historic designation did not alter the balancing process.

## IV. Conclusion

The Order of the Zoning Commission is hereby

*Affirmed*.